1  **Robert J. Beles** Bar No. 41993
   **Paul McCarthy** Bar No. 139497
2  Law Offices of Beles & Beles
   One Kaiser Plaza, Suite 2300
3  Oakland, California 94612-3642
   Tel No. (510) 836-0100
4  Fax. No. (510) 832-3690

5  Attorney for *Petitioner ROLANDO FERNANDEZ*

FILED

MAY 2 0 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

6

7

8

9              𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔆𝔬𝔲𝔯𝔱
               𝔑𝔬𝔯𝔱𝔥𝔢𝔯𝔫 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔞𝔩𝔦𝔣𝔬𝔯𝔫𝔦𝔞
10
                                              **C13-2296** RS
11  ROLANDO FERNANDEZ,                No.

12          *Petitioner,*             PETITION FOR WRIT OF HABEAS CORPUS;
        v.                            VERIFICATION; MEMORANDUM OF POINTS
13                                    AND AUTHORITIES
    GREG LEWIS, Warden, Pelican Bay
14  State Prison,

15          *Respondent,*

16  PEOPLE OF THE STATE OF CALIFORNIA,

17          *Real Party in Interest.*

18
              **PETITION FOR WRIT OF HABEAS CORPUS**
19
                        **VERIFICATION**
20
          **MEMORANDUM OF POINTS AND AUTHORITIES**
21

22

23

24

25

26

27

28

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1

## TABLE OF CONTENTS

2   item                                                                                        page no.

3   TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

4   PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

5       1. Statement of Custody and Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

6       2. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-3

7           a. The shooting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-3

8           b. Prosecution's witnesses to the shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . p-4

9           c. Defense witnesses to the shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-5

10          d. Petitioner's arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-7

11          e. Police investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-8

12          f. Autopsy results. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-9

13          g. Petitioner's testimony. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-10

14          i. Defense expert witness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-12

15          j. Jury instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-13

16      3. Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-14

17      4. Need for Habeas Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-15

18      5. Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-15

19   VERIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-15

20   MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . m-1

21   1. The court's refusal to instruct the jury on the heat of passion/sudden quarrel
     theory of voluntary manslaughter was constitutional error that denied petitioner's
22   Fifth, Sixth and Fourteenth Amendment rights and requires reversal of his
     conviction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-1

23          a. The trial court has a duty to instruct on lesser included offenses where
24          there is substantial evidence to merit consideration by the jury. . . . . . . . . m-1

25          b. The Court of Appeal erred in concluding that the heat of passion
            instruction or provocation instruction did not need to be given. . . . . . . . m-4
26
            c. The instructional errors were prejudicial. . . . . . . . . . . . . . . . . . . . . . . . m-7
27

28                                                          i

1

*item*                                                                                                    *page no.*

2. The trial court violated petitioner's right to a fair trial when it refused permit
petitioner to admit evidence of Narrowing's gang membership.  . . . . . . . . . . . . .  m-8

3. The trial court's limitations on the use of the self-defense instruction violated
petitioner's constitutional right to present a defense and have the jury determine
every material issue presented by the evidence, as guaranteed by the Fifth, Sixth
and Fourteenth Amendments, and lightened the prosecution's burden of proof in
violation of the due process clause and requirement of proof beyond a reasonable
doubt guaranteed by the Fifth and Fourteenth Amendments.  . . . . . . . . . . . . . .  m-10

4. Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ii

1

## TABLE OF AUTHORITIES

2

*cases*                                                                                                   *page no.*

3 *Alcala v. Woodfern*, 334 F.3d 862 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . m-6, m-7

4 *Canella v. California,* 491 U.S. 263, 109 S. Ct. 2419, 105 L. Ed. 2d 218 (1989) . . . . . . m-9

5 *Chambers v. Mississippi,* 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) . . . . . m-11

6 *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) . . . . . . . . m-8

7 *Chi v. Cambra*, 360 F.3d 997 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-7, m-13

8 *Conde v. Henry*, 198 F.3d 734 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-9

9 *Cool v. United States*, 409 U.S. 100, 93 S. Ct. 354,
34 L. Ed. 2d 335 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

10 *Crane v. Kentucky*, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) . . . . . . . m-8-11

11 *Depetris v. Kuykendall,* 239 F.3d 1057 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . m-9-10

12 *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475,116 L. Ed. 2d 385 (1991) . . . . . . . . . . m-9

13 *Franklin v. Francis,* 471 U.S. 307, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344 (1985) . . . . m-11

14 *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

15 *Hanna v. Riveland* 87 F.3d 1034 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

16 *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980) . . . . . . . m-11

17 *Holmes v. South Carolina,* 547 U.S. 319, 126 S. Ct. 1727,
18 164 L. Ed. 2d 503 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8, m-10

19 *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) . . . . . . . . . . . . . m-3

20 *Jackson v. Nevada*, 688 F.3d 1091 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-9

21 *LaJoie v. Thompson,* 217 F.3d 663 at 668 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . m-9-10

22 *Martinez v Garcia*, 379 F.3d 1034 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

23 *Martinez v. Borg*, 937 F.2d 422 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

24 *Mullaney v. Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975) . . . . . . . . m-11

25 *Nguyen v. Adams*, 445 Fed. Appx. 963, 966, 2011 U.S. App. LEXIS 16349
(9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

26 *Olden v. Kentucky* (1988) 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988) . m-8-10
27

28

| *cases* | *page no.* |
|---|---|

*Ortiz v. Yates,* 704 F.3d 1026 (9th Cir. 2012.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8

*Patterson v. New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977) . . . . . . m-11

*People v. Barton* (1995) 12 Cal. 4th 186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

*People v. Breverman* (1998) 19 Cal.4th 142 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2-6

*People v. Lasko* (2000) 23 Cal.4th 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

*People v. Lee* (1999) 20 Cal.4th 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

*People v. Manriquez* (2005) 37 Cal.4th 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

*People v. Moye* (2009) 47 Cal.4th 537 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

*People v. Rios* (2000) 23 Cal.4th 450 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-4

*People v. Ross* (2007) 155 Cal.App.4th 1033 . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-12-13

*People v. St. Martin* (1970) 1 Cal.3d 524 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-6-7

*People v. Thomas* (1987) 43 Cal.3d 818 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

*People v. Valentine* (1946) 28 Cal.2d 121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

*People v. Wickersham* (1982) 32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2-3

*Stark v. Hickman,* 455 F.3d 1070 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

*Ulster County Court v. Allen* 442 U.S. 140, 99 S.Ct. 2213, 2224-2227,
60 L.Ed.2d 777 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

*United States v. Escobar de Bright*, 742 F.2d 1196 (9th Cir. 1984.) . . . . . . . . . . . . . . m-2-7

*United States v. Gaudin*, 515 U.S. 506, 115 S. Ct. 2310,
132 L. Ed. 2d 444 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-3, m-7

*United States v. Hayat*, 710 F.3d 875 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . m-8

*United States v. Sayetsitty,* 107 F.3d 1405 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . m-2, m-7

*United States v. Unruh*, 855 F.2d 1363 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . m-2, m-7

*Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). . . . . . . . . m-8

*Yates v. Evatt*, 500 U.S. 391, 111 S. Ct. 1884, 114 L. Ed. 2d 432 (1991) . . . . . . . . . . m-11

iv

*statutes*  page no.

Penal Code section 190.2 (a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1

Penal Code section 192(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-2

Penal Code section 1202.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-11

Penal Code section 12022.53(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-1, p-2

United States Constitution, Fifth Amendment . . . . . . . . . . . . p-5, p-6, p-14, m-1-3, m-7-10

United States Constitution, Fourteenth Amendment . . . . . . . . . . . . . . p-14, m-1-3, m-7-11

United States Constitution, Sixth Amendment . . . . . . . . . . . . . . . . . p-14, m-1, m-3, m-7-11

*jury instructions*  page no.

CALCRIM 505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

CALCRIM 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-13

CALCRIM 570 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . p-13

CALCRIM 571 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

CALCRIM 3471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8, m-10

CALCRIM 3472 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-10

CALCRIM 3474 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . m-8

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1

2

United States District Court
Northern District of California

3

4

5

6

7

8

9

| ROLANDO FERNANDEZ, | No. |
|---|---|
| *Petitioner,* <br> v. | PETITION FOR WRIT OF HABEAS CORPUS |
| GREW LEWIS, Warden, Pelican Bay State Prison, | |
| *Respondent,* | |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| *Real Party in Interest.* | |

10

## PETITION FOR WRIT OF HABEAS CORPUS

11

12

Comes now petitioner, Rolando Fernandez, petitions this court for a writ of habeas corpus.

13

### 1. Statement of Custody and Jurisdiction

14

15

16

17

18

19

20

21

22

23

24

1. On November 16, 2006, the San Mateo County District Attorney filed an indictment charging petitioner, Rolando Fernandez, and Domingo Samuel Narrowing, with two counts of murder in violation of Penal Code section 187(a). (Clerk's Transcript ("CT.") vol.1, pp. 1-5.) The victim named in count 1 was Jesus Hernandez and the victim named in count 2 was Humberto Calderon. As to both counts, it was alleged that petitioner personally used a firearm causing death, Penal Code section 12022.53(d), and committed multiple murder, Penal Code section 190.2 (a)(3). Narrowing was charged in addition in count 3 with one count of murder of Ignacio Villalobos-Mendes, and in count 4 with assault with a firearm on Camillo Serrano. Each count alleged enhancement allegations for firearm use. An additional multiple murder special circumstance was alleged as to count 3 and an enhancement for causing great bodily injury, Penal Code section 12022.7, was alleged as to count 4.

25

26

27

2. Jury trial began on May 7, 2007, with jury selection beginning on June 3, 2007. (CT. vol. 1, p. 260, CT. vol. 3, p. 825-826.).

28

p-1

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1        3. On June 6, 2007, Narrowing entered a negotiated plea to one count of voluntary

2  manslaughter with a weapon use enhancement. Narrowing was sentenced on July 17 to a term

3  of 21 years in prison. (CT. vol. 4, p. 1126.)

4        4. On July 10, 2007, a jury convicted petitioner as charged, and found true firearm use

5  allegations. The special circumstances allegation was found not true. (CT. vol. 4, , p. 1062-

6  1064.)

7        5. On September 10, 2007, petitioner filed a motion to modify the verdict on both counts

8  to voluntary manslaughter. (CT. vol. 4, , p. 1069-1073.)

9        6. On September 16, 2007, the defense asked for a continuance to prepare a new trial

10  motion on the grounds of jury misconduct. (CT. vol. 4, , p. 1077-1082.) Sentencing was

11  continued to October 7. (CT. vol. 4, , p. 1988-1989.)

12        7. On September 20, 2007, the defense filed a motion for release of jury information.

13  (CT. vol. 4, , p. 1092-1095.) On October 7, the parties agreed to a procedure to permit

14  investigation into the issue of misconduct. (CT. vol. 4, , p. 1100-1101.)

15        8. On November 14, 2007 after the court took testimony from one juror, the defense

16  renewed its motion for additional information. The motion was denied, as was the defense

17  motion to reduce the offense. Petitioner was sentenced to 80 years to life: consecutive terms on

18  each count of 15 to life plus 25 to on the life enhancement under section 12022.53(d).

19  Petitioner was given credit for 945 days of pretrial confinement. A $200 restitution fine under

20  Penal Code section 1202.4 was imposed and the court ordered victim compensation of

21  $14,015.72. (CT. vol. 4, , p. 1116-1121.)

22        9. On November 19, 2007 a timely notice of appeal was filed. (CT. vol. 4, , pp. 1122-

23  1124.)

24        10. Petitioner has pursued a timely direct appeal of his conviction. On December 14,

25  2010, petitioner filed an appeal in the First District Court of Appeal contending instructional

26  error. On November 11, 2011, the Court of Appeal affirmed petitioner's judgment. On January

27  3, 2012, petitioner filed a petition for review with the California Supreme Court, which was

28

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1  denied on February 22, 2012. This petition is filed within one year and 90 days of the California

2  Supreme Court's denial of review and is timely.

3  11. Petitioner (CDC# G37895) is currently in the custody of respondent, Greg Lewis,

4  Warden, Pelican Bay State Prison.

5  ## 2. Statement of Facts

6  ### a. The shooting [1]

7  12. On the night of April 14, 2006, a fight erupted between two groups of people in the

8  patio area of the Headquarters Bar in Redwood City. In the end, three men were dead from

9  gunshot wounds and others were injured.

10  13. That night, petitioner met his friends Ignacio Mendes (the victim listed in count 3 of

11  the indictment) and Ruben Ramos at the Headquarters bar. They were also with a man in a gray

12  hooded sweatshirt who was never identified. (Reporter's Transcript ("RT.") vol. 16, p. 981-

13  988.) The men were drinking heavily and became intoxicated. (RT. vol. 16, p. 988, 1010, 1038,

14  1051.)

15  14. Another group arrived at the bar between 10:30 and 11:30. The group included Jesus

16  Hernandez (the victim listed in count 1), his girlfriend Juana Pena, Angie Cervantes and her

17  brother, Joaquin Laguna. (RT. vol. 15, p. 850-855.) Cervantes testified that the group got a

18  table, ordered drinks and began dancing. (RT. vol. 15, p. 856-857.) They noticed the men in

19  petitioner's group staring at them. (RT. vol. 15, p. 860-861, 895, 946, 974.) Cervantes thought

20  the men, including petitioner, were intoxicated. (RT. vol. 15, p. 924-928, RT. vol. 16, p. 948.)

21  15. Jesus Hernandez had an altercation with the man in the gray sweatshirt. (RT. vol. 15,

22  p. 859-861, RT. vol. 16, p. 1061.) Hernandez made a phone call and a group of seven to ten

23  men, including co-defendant Narrowing and Humberto Calderon (the victim listed in count 2),

24  arrived. (RT. vol. 15, p. 899, 915.)

25

26  [1] At trial several participants, including the victims, were identified by nicknames. Hernandez is also
referred to as "Chuy," Calderon is referred to as "Foot," and Mendes is referred to as "Chano." Former

27  co-defendant Narrowing is referred to as "Pacman." For the sake of clarity, throughout this brief they
will be referred to by their given names, even where witnesses used nicknames.

28

16. At this point, petitioner's group had gone out to the patio. (RT. vol. 16, p. 990-991.) Hernandez's group followed, a fight began, and gunfire followed. (RT. vol. 16, p. 1098-1100; 1102.)

### b. Prosecution's witnesses to the shooting.

17. Narrowing was the first person to shoot.[2] After gunshots were heard, people ran into the bar from the patio and fled. (RT. vol. 16, p. 956.) One of the first people through the door was Ignacio Mendes who fell down after a few steps; Narrowing was right behind him with a gun. (RT. vol. 1, p. 993-995.) Narrowing ran out after Mendes fell and shots continued to be fired in the patio area. (RT. vol. 15, p. 997.) Narrowing ultimately shot and killed Mendes and also shot a member of his own group, Camillo Serrano (the victim listed in count 4). Narrowing left the area after he was shot in the jaw.

18. After Narrowing began shooting, petitioner allegedly pulled a gun and began firing. Two witnesses testified that they saw petitioner firing at two people who were standing by the gate. (RT. vol. 16, p. 1069, 1107-1108.) Hernandez and Calderon were standing near a locked gate leading out of the patio area when they were shot.

19. One witness testified he saw no one shooting at petitioner during that time. (RT. vol. 16, p. 1069.) Another witnesses testified that he was hiding in a closet by an ice machine when petitioner came into the closet and changed the clip in his gun. (RT. vol. 16, p. 1109.) Petitioner did not say anything to him and reloaded his gun. (RT. vol. 16, p. 1140.) Petitioner seemed startled and "chaotic." (RT. vol. 16, p. 1109-1111; 1140.) When petitioner left the closet the witness heard more shots. (RT. vol. 16, p. 1117-1118.)

20. When the shooting stopped, the witness hiding in the closet went inside and saw petitioner holding the body of Mendes and crying and calling his name. (RT. vol. 16, p. 1120,

---

[2] Although the prosecutor argued that the evidence was not clear on this point, (25RT 2270-2272), Narrowing was indicted by the grand jury under the provocative act theory as to the murders of Calderon and Hernandez. The prosecutor defended those charges against Narrowing's 995 motion made on the grounds that this theory did not apply. His statement of the facts indicated that there was an argument occurring when Naranojo opened fire, and that he was the only person with a gun at that time. (See Prosecution Response, 1CT. 42-56.)

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1144.) He was surprised that petitioner was still there after he had been shooting at people. (RT. vol. 16, p. 1120, 1143-1145.)

### c. Defense witnesses to the shooting.

21. Michael Bass[3] testified he was with Narrowing at a birthday party for Calderon when Calderon got a call and said they had to go to Headquarters to help Hernandez. (RT. vol. 23, p. 2088, 2090.) Narrowing dropped them off and said he was going to park the car. (RT. vol. 23, p. 2099.) Bass followed people outside to the patio. (RT. vol. 23, p. 2091.) He saw Hernandez fighting someone and he joined in. Almost immediately gunshots were fired from very nearby. (RT. vol. 23, p. 2096.) Bass was standing next to Hernandez when he was shot. (RT. vol. 23, p. 2093.) He heard about 20 gunshots. (RT. vol. 23, p. 2109.) He knew both petitioner and Mendes because they were all regular customers at the bar. (RT. vol. 23, p. 2094-2096.) He did not see petitioner before the fight. (RT. vol. 23, p. 2095.) He also did not see Mendes, but learned later that he had been killed. (RT. vol. 23, p. 2095-2096.) He did not know where Narrowing was when shots were fired (RT. vol. 23, p. 2097), but Narrowing later admitted to Bass that he was firing a gun that night (RT. vol. 23, p. 2102.)

22. After he heard the shots, Bass hopped a fence and then ran down the street. Narrowing was driving on Second Street and picked him up. Narrowing had been shot in the mouth and lips. (RT. vol. 23, p. 2109- 2101.) He dropped Narrowing off at the hospital and went back to the bar where he learned that Hernandez was dead. He went back to the hospital and picked Narrowing up. (RT. vol. 23, p. 2100.)

23. Claudia Alvarez[4] was at the bar with several friends, including Camillo Serrano. About

---

[3] Michael Bass's grand jury testimony was read because Bass invoked his Fifth Amendment rights. (21RT 1892.) The prosecutor refused to grant him immunity. (21RT 1896.)

[4] Alvarez suffers from schizo-affective disorder and was conditionally examined with the agreement of both parties. (RT. vol. 18, p. 1283-1284.) Petitioner waived his right to be present for the examination. (RT. vol. 19, p. 1473.) She admitted she had been drinking and taking medication. She had been advised that can affect her memory. (RT. vol. 19, p. , 1510-1512, 1522). Nabilia Alvarez, Claudia's sister, testified that Claudia is severely mentally ill and sometimes sees and hears things that are not there. (RT. vol. 21, p. 1882- 1883.) She testified that Claudia is not supposed to drink but she was drinking that night. (RT. vol. 21, p. 1883-1884.)

1    1:00 she went to the patio with Serrano to have a cigarette. (RT. vol. 19, p. 1486.) A fight was

2    in progress when they arrived. (RT. vol. 19, p. 1486.) She knew several people at the bar,

3    including Hernandez, Calderon and Narrowing. (RT. vol. 19, p. 1489-1491.) She had seen some

4    people arguing by the pool table before she went to the patio. (RT. vol. 19, p. 1492.) She saw

5    Narrowing pull a gun and heard shots fired. (RT. vol. 19, p. 1500, 1507.) She told officers that

6    Narrowing shot 2 to 3 times. (RT. vol. 19, p. 1517.) Narrowing was the only person she saw

7    shooting. (RT. vol. 19, p. 1520.) People ran out of the bar to the patio when the shots began

8    (RT. vol. 19, p. 1520), but she did not see another gun. (RT. vol. 19, p. 1507.) Serrano was

9    shot. (RT. vol. 19, p. 1504.) When the shooting started she ran inside and tripped over a body

10   on the floor. (RT. vol. 19, p. 1502.) She did not know how many people were shooting. (RT.

11   vol. 19, p. 1514.)

12            24. Camillo Serrano[5] saw Hernandez and his girlfriend at the bar. (RT. vol. 22, p. 2012.)

13   He saw Hernandez go outside two different times while arguing with a short guy. (RT. vol. 22,

14   p. 2017, 2022.) Then Calderon came in with several people. (RT. vol. 22, p. 2012-2014.) They

15   walked quickly out to the patio. (RT. vol. 22, p. 2025.) He also saw tall guy with a low fade go

16   outside along with a bunch of people. (RT. vol. 22, p. 2025-2026.) When he went outside and

17   he saw Calderon fighting the guy Hernandez had been arguing with. (RT. vol. 22, p. 2030-

18   2031.) He heard gunfire from two guns, coming from two different directions. (RT. vol. 22, p.

19   2039.) He was hit in the abdomen. (RT. vol. 22, p. 2034-2035.) He went back inside the bar

20   and Nabila Alvarez pulled him out of the bar. (RT. vol. 22, p. 2043.) They had to step over a

21   body to leave. (RT. vol. 22, p. 2043.) He denied firing a gun that night, but GSR residue was

22   found on his hands. (RT. vol. 22, p. 2036-2037.)

23            25. Jorge Grajada saw an argument occurring in the corner of the bar because a woman

24   was trying to stop a man from going into the patio. (RT. vol. 21, p. 1845.) The man was wearing

25   black clothing and was tall and stocky. (RT. vol. 21, p. 1850.) Finally the man and several other

26   _____

27   [5] Camillo Serrano's grand jury testimony was read to the jury because Serrano invoked his Fifth
     Amendment rights at the time he was called. He testified before the grand jury with a grant of immunity.
     (RT. vol. 22, p. 2005-2006.)

28                                                                p-6

1  people went outside. (RT. vol. 21, p. 1846-1847.) Grajada did not go outside (RT. vol. 21, p.

2  1851), but he saw at least five people in the patio. Then he heard two gunshots. (RT. vol. 21,

3  p. 1848-1849.) After the shots were fired he saw a man with an automatic gun being pulled out

4  of the bar by another man. (RT. vol. 21, p. 1849, 1853, 1861.) The man holding the gun was

5  wearing baggy pants and a shirt and was of medium height. (RT. vol. 21, p. 1853.) Petitioner

6  was not one of these men. (RT. vol. 21, p. 1856.) After being shown his photograph, Garajada

7  testified that he was not sure whether Narrowing was the man with the gun. (RT. vol. 21, p.

8  1862.)

9  26. Nabila Alvarez was at the bar with a group of friends including Camillo Serrano. (RT.

10  vol. 21, p. 1867.) She saw an argument by a pool table and then saw several people rush out to

11  the patio. (RT. vol. 21, p. 1874.) She heard the gunshots and turned to see Serrano running back

12  inside. (RT. vol. 21, p. 1875.) She never went into the patio. (RT. vol. 21, p. 1873.) She saw

13  Serrano holding his stomach and realized he had been shot. She went to help Serrano and had

14  to step over another man who was lying on the floor. (RT. vol. 21, p. 1877.)

### d. Petitioner's arrest.

16  27. CHP officers who were responding to the bar saw a blue speeding away from the bar

17  on March Road. (RT. vol. 17, p. 1162.) They made a u-turn and followed with lights and sirens

18  activated. (RT. vol. 17, p. 1164.) After briefly losing sight of the car, they found it on 15th Street

19  where it had crashed into a parked car. (RT. vol. 17, p. 1165.)

20  28. Petitioner approached the officers and told them that his friend had been shot and

21  asked them to send help to the bar. (RT. vol. 17, p. 1169.) Petitioner told them that the only

22  person he knew in the bar was "Chano." He told them that he fled when he saw gunshot flashes.

23  (RT. vol. 17, p. 1175.) He told them he had been shot, but this proved not to be so. (RT. vol.

24  17, p. 1180.) He was cooperative and seemed very scared, and was concerned that the people

25  shooting at the bar would find him and kill him. (RT. vol. 17, p. 1175-1177.)

26  29. Officers searched petitioner's vehicle and the surrounding area, but found no

27  contraband or weapons. (RT. vol. 17, p. 1169-1170.) They smelled alcohol on petitioner's

28  p-7

1   breath. (RT. vol. 17, p. 1176.) Redwood City Police Officer Metzger interviewed petitioner at

2   the scene about 2:30 a.m. Petitioner told him that he was at the bar with Chano and Chano's

3   friends and had consumed alcohol and cocaine. A fight broke out on the patio and he and Chano

4   went to watch. As they reached the door to the patio shooting began and Chano dropped to the

5   floor. (RT. vol. 17, p. 1186-1187.) Petitioner was unable to help him and was pushed out of the

6   bar by the crowd that was fleeing. (RT. vol. 17, p. 1187.)

7       30. Officers conducted a yard to yard search and found a handgun in a small bush in the

8   front yard of 951 15th Avenue. (RT. vol. 17, p. 1237-1239, 1244-1245.) The magazine

9   contained nine live rounds and there was one round in the chamber. (RT. vol. 17, p. 1246.) The

10  gun was tested for DNA and fingerprints. No useable prints were found. (RT. vol. 19, p. 1428-

11  1429.) Petitioner could not be excluded as contributing source of DNA. (RT. vol. 20, p. 1559.)

12  Although he initially told police the gun was not his, petitioner admitted at trial that it belonged

13  to him. (RT. vol. 22, p. 1964.)

14      31. A few weeks after the shooting a Glock magazine with four rounds in it was found

15  in the backyard of 60 St. Mary's Place, directly behind the house where Petitioner was arrested.

16  (RT. vol. 17, p. 1255-1256, 1262.) Officers believed that it could have been thrown over the

17  roof of the house on 15th Street into this backyard. (RT. vol. 17, p. 1274.)

18      32. Officers conducted a GSR test on petitioner and arrested him for drunk driving. (RT.

19  vol. 17, p. 1188-1189, 1192.) He had a level of .131 micrograms/ml of methamphetamine in

20  his blood. (RT. vol. 17, p. 1206.) This was a consistent with recent use and abuse. (RT. vol. 17,

21  p. 1226.) Methamphetamine tends to make the user aggressive. (RT. vol. 17, p. 1226.) His

22  blood alcohol level was .09. (RT. vol. 17, p. 1206, 1215.) Based on the delay between the

23  incident and the drawing of the blood it was estimated that petitioner's blood alcohol level at

24  the time of the incident was .15. (RT. vol. 17, p. 1218-1219.) This level would impair judgment.

25  (RT. vol. 17, p. 1216, 1220.)

26                          e. Police investigation.

27      33. Officers arrived at the bar within two minutes after the last shot had been fired. They

28                                          p-8

1    found Calderon and Hernandez, both with multiple gunshot wounds, lying in front of a locked

2    gate on the southeast side of the patio. (RT. vol. 15, p. 737-740.) Both men were declared dead

3    at the scene. (RT. vol. 15, p. 741-742.)

4        34. Officers found no weapons at the scene (RT. vol. 15, p. 751-752), but did recover

5    multiple expended cartridges and casings and baggies containing a green leafy substance and a

6    white crystal substance. (RT. vol. 19, p. 1445.)

7        35. A blood trail matched to Narrowing originated in the patio, went into the bar and

8    continued until it ended down Second Street. (RT. vol. 20, p. 1726-1727, 1753.)

9    36. Several of the 9mm casings recovered at the scene were determined to have been fired from

10   the 9mm Glock recovered at the scene of petitioner's arrest. (RT. vol. 20, p. 1632.) Another

11   9mm casing could not be confirmed or excluded from being fired by the recovered Glock. (RT.

12   vol. 20, p. 1642.) Five other 9mm casings were consistent with having been fired from a Glock,

13   but could not be matched to the recovered gun. (RT. vol. 20, p. 1671.) Five .38 caliber bullets

14   were recovered from the patio that could not have been fired from the Glock. (RT. vol. 20, p.

15   1682-1685.) A sixth casing was recovered, but was not suitable for comparison. (RT. vol. 20,

16   p. 1686.)

17       37. A criminalist testified that he found particles consistent with GSR on the left hand of

18   Calderon and on the right hand of Hernandez. He also found one specific particle of GSR on

19   the right hand of Serrano (RT. vol. 23, p. 2073).

20                                    f. Autopsy results.

21       38. Hernandez died from multiple gunshot wounds. (RT. vol. 15, p. 769.) He had been

22   shot in the front of the chest (RT. vol. 15, p. 770) and the back of the head (RT. vol. 15, p.

23   775.) The bullet to the chest remained in the body and was turned over to police. The bullet in

24   the head had fragmented. (RT. vol. 15, p. 772, 776.) The wound to the brain would have caused

25   him to immediately collapse and was fatal within three to five minutes. (RT. vol. 15, p. 776,

26   824.) There was no evidence that the gunshots were contact wounds. (RT. vol. 15, p. 826.)

27   Hernandez's blood alcohol level was .02 at the time of his death. (RT. vol. 15, p. 777.) He had

28                                         p-9

blunt trauma injuries on his face consistent with having been in a fist fight. (RT. vol. 15, p. 833.)

39. Calderon died from five to six gunshot wounds (RT. vol. 15, p. 782, 788-790.) One bullet entered the right side of his neck and exited through the upper left side of the mouth. (RT. vol. 15, p. 783.) This was a very serious injury but not necessarily fatal. (RT. vol. 15, p. 784.) It would likely have incapacitated him. (RT. vol. 15, p. 801.) He also suffered gunshot wounds to his left buttock that caused perforating wounds in the torso, abdominal cavity, and major arteries and veins in the deep pelvic region. (RT. vol. 15, p. 787.) He sustained three to four other gunshot wounds to the backs of his right and left legs. (RT. vol. 15, p. 787.) Calderon had a .07 blood alcohol level at the time of his death. (RT. vol. 15, p. 791.) He also had injuries consistent with a fist fight. (RT. vol. 15, p. 834-835.) A 9mm casing recovered during the autopsy (RT. vol. 19, p. 1422, RT. vol. 20, p. 1662) could not be matched with the recovered Glock. (RT. vol. 20, p. 1663.)

40. Mendes died from a single gunshot wound to the torso. (RT. vol. 15, p. 815.) His blood alcohol level was .19 at the time of death. Small amounts of methamphetamine and valium were also present. (RT. vol. 15, p. 816-817.)

### g. Petitioner's testimony.

41. Petitioner was 26 years old at the time of the shootings and lived in San Jose with his wife and two daughters. (RT. vol. 22, p. 1913.) He had known Mendes for a couple of years and they were very good friends. Ruben Ramos is his cousin. (RT. vol. 22, p. 1915-1916.) On the night of the shootings, he met the two men at Headquarters Bar around 9:20 pm. (RT. vol. 22, p. 1917.) He was carrying a gun that night for protection because a couple of months earlier because he had been involved in a drug deal that went bad and he was getting death threats. (RT. vol. 22, p. 1926-1928.) He had previously sold heroin as well as marijuana. (RT. vol. 22, p. 1945-1946, 1950.)

42. Petitioner testified he had not had anything to drink or used any drugs prior to going to the bar. (RT. vol. 22, p. 1917.) After he arrived, he drank about 10 bottles of Corona and also 3 Remy Martins between 10:00 p.m. and 1:00 a.m. (RT. vol. 22, p. 1918-1919.) He also

1  used cocaine or methamphetamine about 12:30. (RT. vol. 22, p. 1945, 1951.) He went outside

2  to the patio about five times during the night to smoke a cigarette. (RT. vol. 22, p. 1922.) He

3  did not hear any arguments or fighting. (RT. vol. 22, p. 1923-1924.)

4      43. There were several people at the bar who he thought were Norteño gang members.

5  They were dancing and getting aggressive. (RT. vol. 22, p. 1925.) Petitioner was on the patio

6  when he saw Mendes hit someone in the head and assume a fighting position. Ramos was trying

7  to stop the fight. Then about twenty people started beating Ramos. (RT. vol. 22, p. 1930-1932.)

8  After Mendes hit the man, shots started going off. (RT. vol. 22, p. 1933.)

9      44. Petitioner began firing back[6] towards the area the gunfire was coming from. (RT. vol.

10  22, p. 1933.) The person who was firing was moving toward the gate. (RT. vol. 22, p. 1934.)

11  Petitioner testified he was really scared and thought he was being hit. (RT. vol. 22, p. 1935.) He

12  did not know who was shooting at him, but he thought the man was a Norteño because of his

13  clothing. (RT. vol. 22, p. 1935.) His gun jammed and as he was trying to clear it, he saw two

14  people running towards him and firing. (RT. vol. 22, p. 1936.) He cleared the jam and fired the

15  rest of his clip back at them. (RT. vol. 22, p. 1937.) He ran into an ice room to reload. Too

16  many people were crowding the door for him to get out. (RT. vol. 22, p. 1937.) He saw a

17  Norteño in the ice room, but no threats or confrontation occurred. While he was reloading, he

18  continued to hear shots. (RT. vol. 22, p. 1939.) He stayed there long enough to reload his gun.

19  He was scared the whole time. (RT. vol. 22, p. 1939.) He panicked and thought that he had

20  been shot. He had never been shot at before and all he wanted to do was to protect himself. (RT.

21  vol. 22, p. 1946.)

22      45. He left the ice room and ran for the exit, firing two to three more shots towards the

23  gate area where shots where coming from. (RT. vol. 22, p. 1940.) He was not looking where he

24  was shooting (RT. vol. 22, p. 1940), except that it was in the direction that the shots were

25  coming from. (RT. vol. 22, p. 1964, 1975.) Inside the bar, he saw Mendes on the floor. He tried

26

27  [6] Petitioner admitted that he initially told the police that the Mendes was the one who fired the gun that night. (RT. vol. 22, p. 1967.)

28

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1   to help, but then left as more Norteños came in asking what had happened. (RT. vol. 22, p.

2   1941-1942.) There were carloads of Norteños arriving as he left. (RT. vol. 22, p. 1942.)

3   46. As petitioner drove off, he thought Norteños were chasing him. When he noticed the

4   police behind him, he got confused, and crashed his car. (RT. vol. 22, p. 1943.) He tossed his

5   gun across the street and threw an extra clip into the backyard behind him. (RT. vol. 22, p.

6   1944.) He threw the gun away because he did not want the police to see it and shoot him. He

7   lied to them when they asked if he had a gun. (RT. vol. 22, p. 1985-1986.)

8                                   i. Defense expert witness.

9   47. The defense called Dr. Phillip Trompetter, a clinical psychologist who specializes in

10  police officer reactions during deadly force confrontations. (RT. vol. 23, p. 2118-2121.) He

11  described common distortions which can occur during such encounters where even trained

12  police officers react in unexpected ways. (RT. vol. 23, p. 2125, 2137.) Between 17 and 38

13  percent of officer involved shootings are based on mistakes of fact. (RT. vol. 23, p. 2130.)

14  Lighting conditions and the stress of a deadly force confrontation lead to confusion and

15  distortions. (RT. vol. 23, p. 2130-2132.)

16  48. Dr. Trompetter testified that perceptual distortions can include tunnel vision and

17  slowed processing time. (RT. vol. 23, p. 2137.) Officers have reported that they believed they

18  had been shot during a confrontation and learned later that they were not injured. (RT. vol. 23,

19  p. 2136.) In deadly force confrontations, even trained officers can have a delay in registering that

20  a threat no longer exists and keep shooting past the time the danger has ceased. (RT. vol. 23,

21  p. 2137.)

22  49. The prosecutor attacked the applicability of Dr. Trompetter's studies to this case

23  because petitioner is not a trained police officer and because drugs and alcohol had not been

24  involved in any of the officer studies. (RT. vol. 23, p. 2142-2148.) Trompetter agreed that parts

25  of petitioner's statements that did not fit the evidence. (RT. vol. 23, p. 2153.) However, some

26  of petitioner's statements were consistent with the physical evidence which established that there

27  were two shooters located in two different positions on the patio. He also noted that petitioner

28                                          p-12

1    was not the person who shot first, but rather that he reacted once shooting began. (RT. vol. 23,

2    p. 2181.) Petitioner had reported that he felt threatened and in danger from the time Narrowing

3    fired the first shot until he was arrested. (RT. vol. 23, p. 2184.) This is consistent with police

4    reactions in shootings. They frequently continue to perceive a threat after the actual danger has

5    passed. (RT. vol. 23, p. 2183.)

### j. Jury instructions.

7    50. The prosecutor obtained a grand jury indictment of three counts of murder and one

8    count of assault with deadly weapon against Narrowing initially on the theory that Narrowing

9    personally shot Mendes and Serrano and was responsible for the murders of Hernandez and

10    Calderon on a provocative act theory. Petitioner was indicted for murder as the shooter of

11    Hernandez and Calderon.

12    51. After Narrowing's negotiated guilty plea to one count of voluntary manslaughter in

13    the midst of jury selection, the prosecutor described petitioner's acts as an execution while the

14    defense argued that petitioner was responding to seeing his friend shot.

15    52. The defense argued that petitioner believed that Narrowing and his friends, whom

16    he believed to be members of the Norteño gang, were a continuing danger and shot to protect

17    himself. Petitioner even described himself as panicked and scared throughout the shooting

18    incident until the time of his arrest.

19    53. Defense counsel requested that the court instruct with the standard voluntary

20    manslaughter instruction, CALCRIM 570, based on both imperfect self defense and heat of

21    passion. (CT. vol. 6, p. 1601.) He also requested instruction with CALCRIM 522 relating to the

22    effect of provocation on the degree of murder. Defense counsel argued that the shooting was

23    provoked by the actions of Narrowing as well as by Hernandez and Calderon. (RT. vol. 24, p.

24    2240-2241.) The prosecutor objected to the portion of CALCRIM 522 which discussed

25    provocation reducing murder to manslaughter and the instruction was so modified. (RT. vol.

26    6, p. 1577, RT. vol. 25, p. 2349.)

27    54. The court found that there was no factual basis for provocation:

28

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

"... the fact that Mr. Narrowing allegedly provoked Mr. Fernandez by allegedly shooting first for public policy reasons does not allow Mr. Fernandez to shoot two other people and in my view of the defendant's testimony and the different versions of his explanation for what he was doing at the Headquarters Bar there was no claim that he ended up shooting Mr. Hernandez and Mr. Calderon because he was provoked to do so."

(RT. vol. 24, p. 2242.)

55. The prosecutor argued that the special instruction requested by the defense which read, "If you find the defendant acted in a Sudden Quarrel you must find him not guilty of murder," (RT. vol. 24, p. 2242, CT. vol. 6, p.. 1667) was precluded by petitioner's claim of self defense. (RT. vol. 24, p. 2243-2245.) The court agreed that based on petitioner's testimony that he shot in self defense he was not entitled to a heat of passion instruction. (RT. vol. 24, p. 2242 and 2245.) However, the court did instruct on the effect that provocation could have on the degree of murder.

56. The jury rejected the prosecution theory that these were willful, deliberate and premeditated first degree murders, but convicted Fernandez of second degree murder.

### 3. Claims for Relief

57. The trial court's failure to instruct on heat of passion manslaughter, provoked on the actions of Narrowing, violate petitioner's constitutional right to present a defense and have the jury determine every material issue presented by the evidence, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

58. The trial court's denial of admitting evidence of Narrowing's gang membership violated petitioner's due process rights under the Fifth and Fourteenth Amendments by rendering his trial fundamentally unfair.

59. The trial court's limitations on the use of the self-defense instruction violated petitioner's constitutional right to present a defense and have the jury determine every material issue presented by the evidence, as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and lightened the prosecution's burden of proof in violation of the due process clause of the Fifth and Fourteenth Amendments.

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1

**4. Need for Habeas Relief**

2

60.Petitioner has no clear and speedy remedy at law.

3

**5. Prayer for Relief**

4

61.Wherefore, petitioner prays that this court issue a writ of habeas corpus and order

5

such other and further relief as it may find proper.

6

Dated: Oakland, California, Monday, May 20, 2013.

7

8

9
Robert J. Beles
Paul McCarthy

10
Attorneys for *Petitioner ROLANDO FERNANDEZ*

11

12

**VERIFICATION**

13
Petitioner is in custody and incarcerated outside of Alameda County. I therefore verify
the petition on his behalf. I declare under penalty of perjury that the facts set forth in this

14
petition are true and correct based on my review of the record. Executed in Oakland, California,
on May 20, 2013.

15

16

17

18
Paul McCarthy
Attorney for *Petitioner ROLANDO FERNANDEZ*

19

20

21

22

23

24

25

26

27

28
p-15

1

2

United States District Court
Northern District of California

3    ROLANDO FERNANDEZ,                          No.

4                    *Petitioner,*               MEMORANDUM OF POINTS AND
                 v.                              AUTHORITIES
5
     GREG LEWIS, Warden, Pelican Bay
6    State Prison,

7                    *Respondent,*

8    PEOPLE OF THE STATE OF CALIFORNIA,

9                *Real Party in Interest.*

10
                  MEMORANDUM OF POINTS AND AUTHORITIES
11
         **1. The court's refusal to instruct the jury on the heat of passion/sudden**
12       **quarrel theory of voluntary manslaughter was constitutional error that**
         **denied petitioner's Fifth, Sixth and Fourteenth Amendment rights and**
13                         **requires reversal of his conviction.**

14       Although a state court's erroneous application of state law does not, standing alone,

15   violate the federal constitution, state law errors that render a trial fundamentally unfair violate

16   the due process clause of the Fifth and Fourteenth Amendments. *Estelle v. McGuire*, 502 U.S.

17   62, 72-73, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), *Hicks v. Oklahoma*, 447 U.S. 343, 346,

18   100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980) Here, the state court incorrectly held that the jury

19   need not have been instructed on the heat of passion theory of voluntary manslaughter. This

20   theory was supported by the evidence at trial and this instructional failure deprived petitioner

21   of his federal constitutional rights under the Fifth, Sixth and Fourteenth Amendments to the

22   United States Constitution. The error requires issuance of a writ.

23              **a. The trial court has a duty to instruct on lesser included offenses**
               **where there is substantial evidence to merit consideration by the jury.**
24
         The refusal or failure to instruct on the defendant's theory of the case, including
25
     instructions on lesser offenses, violates the defendant's right to adequate instructions on the
26
     theory of the defense in violation of defendant's Sixth and Fourteenth Amendments to the
27

28                                         m-1

1  United States Constitution, the Sixth and Fourteenth Amendment right to a jury trial, and the

2  due process clause of the Fifth and Fourteenth Amendments to the United States Constitution.

3  *Conde v. Henry*, 198 F.3d 734, 739-740 (9th Cir. 1999), *United States v. Unruh*, 855 F.2d 1363,

4  1372 (9th Cir. 1988), *United States v. Escobar de Bright*, 742 F.2d 1196, 1201-1202 (9th Cir.

5  1984.) Petitioner has a due process right under the Fifth and Fourteenth Amendments to have

6  the jury consider state law defenses recognized that negate elements of the offense. *United States*

7  *v. Sayetsitty,* 107 F.3d 1405, 1414 (9th Cir. 1997.)

8      California prevailing law agrees – the trial court must:

9      ... seek[] the most accurate possible judgment by "ensur[ing] that the jury will
        consider the full range of possible verdicts " included in the charge, regardless of
10     the parties' wishes or tactics. (*[People v.] Wickersham* [(1982)] 32 Cal.3d 307,
        324. . . ) The inference is that every lesser included offense, or theory thereof,
11     which is supported by the evidence must be presented to the jury.

12  *People v. Breverman* (1998) 19 Cal.4th 142 at 155.

13      Under California law, manslaughter is a lesser included offense of murder. The

14  distinguishing feature is that murder includes, but manslaughter lacks, is the element of malice.

15  *People v. Rios* (2000) 23 Cal.4th 450, 460. A charge of murder necessarily includes by

16  implication charges of lesser degrees of murder and both voluntary and involuntary

17  manslaughter. *People v. Thomas* (1987) 43 Cal.3d 818, 824.

18      Voluntary manslaughter exists where the unlawful killing occurs upon "a sudden quarrel

19  or heat of passion." Penal Code section 192(a), *People v. Lasko* (2000) 23 Cal.4th 101, 111-112.

20      Heat of passion arises when "at the time of the killing, the reason of the accused was

21  obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable

22  person of average disposition to act rashly and without deliberation and reflection, and from

23  such passion rather than from judgment.'" *People v. Lee* (1999) 20 Cal.4th 47 at p. 59.

24      Thus, to obtain a guilty verdict on a murder charge, the prosecutor to prove beyond a

25  reasonable doubt that the defendant did not act in the heat of passion. CALJIC No. 8.50, *People*

26  *v. Rios*, 23 Cal.4th at 469-470, *People v. Valentine* (1946) 28 Cal.2d 121, 132. The United

27  States Supreme Court has ruled that placing this burden on the prosecutor is required by the due

28                                                m-2

1   process clause of the Fourteenth Amendment. *Mullaney v. Wilbur,* 421 U.S. 684, 704, 95 S. Ct.

2   1881, 44 L. Ed. 2d 508 (1975) relying on *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25

3   L. Ed. 2d 368 (1970).

4   Where the jury has been misinstructed on an element of the offense – in this case on

5   malice – by omission of a full definition of that element by omitting heat of passion – the error

6   is federal constitutional error under the Sixth and Fourteenth Amendments. *United States v.*

7   *Gaudin,* 515 U.S. 506, 512-19, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995).

8   The Court of Appeal failed to follow established U.S. Supreme Court law. Instead, they

9   relied on the state case of *People v. Wickersham* (1982) 32 Cal.3d 307, which held that the court

10  should not instruct on heat of passion where the facts would give rise to a finding of reasonable

11  self defense. (Slip op., p. 12.) The Court of Appeal improperly analyzed both the facts and the

12  legal requirements for instructing on murder and its lesser included offenses, thus failing to

13  instruct on petitioner's theory of defense as required by the Fifth, Sixth, and Fourteenth

14  Amendments. The prosecutor and the trial court reasoned that heat of passion was inapplicable

15  because petitioner testified that he was acting in self-defense. (RT. vol. 25, p. 2242-2245.) The

16  Court of Appeal erroneously adopted that reasoning. The Court of Appeal's analysis appeared

17  to have been based on a belief that the only evidence of petitioner's state of mind was his

18  testimony. (Slip op., pp. 11-12.)

19  Under California law, the two theories of voluntary manslaughter – imperfect self defense

20  and heat of passion -- are not inconsistent and, if supported by evidence, should be given in the

21  same case. *People v. Breverman* (1998) 19 Cal.4th 142, 154, 159-160 held that in criminal cases,

22  even absent a request, the trial court must instruct on general principles of law relevant to the

23  issues raised by the evidence. This obligation includes giving instructions on lesser included

24  offenses when the evidence raises a question whether all the elements of the charged offense were

25  present, but not when there is no evidence the offense was less than that charged. The trial court

26  must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the

27  instruction, but expressly objects to its being given *People v. Breverman,* 19 Cal. 4th at 154. see

28

m-3

1    also *People v. Barton* (1995) 12 Cal. 4th 186, 196, 199-203 (under California law, the trial court

2    must instruct on heat-of-passion and unreasonable self-defense theories of manslaughter, if

3    supported by evidence, even when defendant objects on the basis that such instructions would

4    conflict with his defense), accord, *Nguyen v. Adams*, 445 Fed. Appx. 963, 966, 2011 U.S. App.

5    LEXIS 16349 (9th Cir. 2011).

6        Moreover, the court misconstrued the heat of passion element of manslaughter by holding

7    that perceiving that people are shooting at you could not support a finding that an ordinary

8    person of average disposition could act rashly or without due deliberation and reflection. *People*

9    *v. Manriquez* (2005) 37 Cal.4th 547, 583-584 . Consequently, even though the court and District

10   Attorney concluded that the defense being raised was self-defense, it was error not to instruct on

11   the heat of passion element of manslaughter since there was substantial evidence on the record

12   supporting this defense.

13                     **b. The Court of Appeal erred in concluding that the heat of passion
                           instruction or provocation instruction did not need to be given.**

14

15       The heat of passion instruction was warranted in this case because there was sufficient

16   evidence to show that the objective component of heat of passion was satisfied (i.e. that the

17   circumstances would have "aroused] the passions of the ordinarily reasonable person"). The

18   Court of Appeal, relying on *People v. Moye* (2009) 47 Cal.4th 537 and distinguishing the

19   California Supreme Court's opinion in *People v. Breverman,* concluded that petitioner's case did

20   not warrant a heat of passion instruction. (Slip op., pp. 10-14.)

21       The Court of Appeal erred in only considering petitioner's testimony where the evidence

22   taken as a whole established that Narrowing started the shooting (that ultimately killed

23   petitioner's friend and injured another individual), after which petitioner responded with

24   gunfire. The incident happened quickly and Narrowing was part of the large, aggressive group

25   perceived to be wearing gang clothing (discussed further below), who came to the bar in response

26   to a call from one of the shooting victims. Along with multiple witness' describing the chaos of

27   the incident, the defense presented witnesses to the encounter and an expert who described the

28                                                    m-4

1    reactions and distortion of perceptions based on studies of police officer involved shootings.

2    Thus, direct and circumstantial evidence supported instruction on heat of passion voluntary

3    manslaughter.

4       The incident in *Breverman* began with an exchange of words between two groups, which

5    grew into a physical fight in which two men were kicked and beaten. The next night one of the

6    beating victims returned, bringing 6-10 other people including the murder victim, to fight the

7    men who had beaten their friends. They were armed with various items, including a knife. One

8    of the men approached the Breverman residence and slashed a car tire. As he walked back to his

9    friends, Breverman came out of the house, saw the tire and the men and returned inside. Four

10    or five members of the group approached the defendant's car again and began hitting it and

11    yelling epithets. Shots were fired from the house, and as the group ran away Breverman came

12    out to his driveway and continued shooting at them. One member of the group, who had not

13    been involved in hitting the car, was killed. (Id., at 149-150.) Breverman told the police he had

14    shot at armed men who were vandalizing his car and whom he feared would come into his

15    house. (Ibid.) He shot because he thought they were coming to kill him. (Id., at 151.)

16       The Court of Appeal found that "there was no such build-up or preamble" in petitioner's

17    case, but that petitioner was focused on fear and panic. (Slip op., pp. 10-14.) However, the

18    evidence taken as a whole established that Narrowing was part of the large, aggressive group

19    perceived to be wearing gang clothing; that a verbal altercation caused Hernandez to call for

20    reinforcements; and that Narrowing and Calderon were among the people who rushed into the

21    bar in response. Petitioner testified that he was concerned that they seemed aggressive (RT. vol.

22    22, p. 1925) and that when they rushed outside he saw a bunch of Norteños arguing. (RT. vol.

23    22, p. 1929.) He saw 20 of them beating up on Ramos. When Mendes became involved shots

24    were fired from nearby - from Narrowing. (RT. vol. 22, p. 1930-1933.) Petitioner responded

25    by firing towards the area where he thought the shots were coming from. (RT. vol. 22, p. 1933.)

26    He described himself as really scared (RT. vol. 22, p. 1935, 1939), feeling threatened as the shots

27    continued (RT. vol. 22, p. 1940), thinking that he had been shot (RT. vol. 22, p. 1935) and

28

1    panicked because he had never been shot at before. (RT. vol. 22, p. 1946.) Combined with Dr.

2    Trumpeter's description of the confusions and distortion felt even by trained police officers,

3    causing them to misperceive danger, there was ample evidence to permit the jury to determine

4    whether a reasonable person would, and that petitioner actually did, act "rashly or without due

5    deliberation and reflection." Thus, direct and circumstantial evidence supported instruction on

6    heat of passion voluntary manslaughter.

7       *Breverman* is also instructive in its analysis of the sufficiency of the evidence of

8    provocation. Sea sponge instruction was warranted because:

9        "...[T]hese was evidence that a sizeable group of young men, armed with
dangerous weapons and harboring a specific hostile intent, trespassed upon
10        domestic property occupied by defendant and acted in a menacing manner. This
intimidating conduct included challenges to the defendant to fight, followed by
11        use of the weapons to batter and smash defendant's vehicle parked in the driveway
of his residence, within a short distance from the front door. Defendant and the
12        other persons in the house all indicated that the number and behavior of the
intruders, which defendant characterized as a "mob," caused immediate fear and
13        panic. Under these circumstances, a reasonable jury could infer that defendant was
aroused to passion, and his reason was thus obscured, by a provocation sufficient
14        to produce such effects in a person of average disposition."

15    *Breverman,* 19 Cal.4th at 163 -164.

16       *Breverman* went on to hold that even though the defendant claimed that he had not aimed

17    at any one or killed anyone intentionally, a jury could have disbelieved that claim and found that

18    he acted while his judgment was obscured. (Ibid.) A similar analysis applies to the facts in this

19    case. And just as in *Breverman*, there was no basis for finding that petitioner was not acting in

20    heat of passion based on adequate provocation where the victims were members of the group

21    which precipitated the incident by fighting, calling reinforcements and beginning the shooting.

22       The California Supreme Court addressed the issue again in *People v. St. Martin* (1970)

23    1 Cal.3d 524. The defendant was found in the cell of the victim and stabbed him when guards

24    tried to intervene. The defense was that when defendant learned that the victim was trying to

25    recruit someone to kill him, he went to his cell to discuss the problem. The victim pulled a knife

26    and attacked him. The defendant claimed that he did not remember what occurred during the

27    fight. *People v. St. Martin,* 1 Cal.3d at 529-530. There was no Sea sponge instruction on

28                             m-6

1  provocation, an error which this court found required reversal. *People v. St. Martin,* 1 Cal.3d

2  at 530-532. It found the error to be prejudicial for the following reasons:

3      "Although the jury was instructed on self-defense, the jury's rejection of that
    defense does not show that it would have also rejected a claim of provocation. The

4      jury was told that the defense of self-defense is not operative in favor of a person
    attacked who renders his assailant incapable of inflicting further injuries and

5      thereafter inflicts further injury on the attacker. On the basis of Sergeant Wilson's
    testimony, the jury may have concluded that defendant, although attacked initially,

6      succeeded in rendering Carter incapable of further injuries but that instead of
    withdrawing he thereafter killed Carter, and such a conclusion, although defeating

7      the claim of self-defense, would not dispose of the claim of provocation."

8  *People v. St. Martin*, 1 Cal.3d at 532.

9      This case was factually similar to *Breverman* and *St. Martin*. Thus, by not instructing on

10  lesser included offenses and state law defenses, the trial court violated petitioner's rights under

11  the Fifth, Sixth, and Fourteenth Amendments. *Conde v. Henry*, 198 F.3d at 739-740, *United*

12  *States v. Unruh*, 855 F.2d at 1372 (9th Cir. 1988), *United States v. Escobar de Bright*, 742 F.2d

13  at 1201-1202· *United States v. Sayetsitty,* 107 F.3d at 1414, *United States v. Gaudin,* 515 U.S.

14  at 512-19.

15  c. The instructional errors were prejudicial.

16      Since the trial court's errors here impinged upon petitioner's federal constitutional rights,

17  a writ must issue unless respondent can prove the error harmless beyond a reasonable doubt.

18  *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

19      The evidence was prejudicial for two reasons. First, the jury rejected a first degree murder

20  verdict. Having been instructed that " .. If you conclude that the defendant committed murder

21  but was provoked, consider the provocation in deciding whether the crime was first or second

22  degree murder," (CT. vol. 6, p. 1577), the jury acquitted petitioner of first degree murder and

23  convicted him of second degree murder – the only verdict option given to them if they believed

24  there had been provocation. Thus, there is a reasonable possibility that petitioner would have

25  received a more favorable outcome had the jury been properly and fully instructed.

26      Second, as the court noted in *People v. St. Martin*, 1 Cal.3d at 532, the fact that the jury

27  rejected self defense and imperfect self defense, does not show that it would have rejected

28  m-7

1    provocation/heat of passion for voluntary manslaughter. Because the self defense instructions

2    allow for limited self defense where there is mutual combat, CALCRIM 3471 (CT. vol. 6, p..

3    1581) or when the danger ceases, CALCRIM 3474, (CT. vol. 6, p.. 1583), those facts would not

4    dispose of the claim of provocation/heat of passion on these facts.

5        In light of the evidence and the jury's verdict of second degree murder where they had

6    been told that provocation could reduce the degree of the offense, it cannot be found beyond

7    a reasonable doubt, that with full and proper instructions on the malice element of murder,

8    petitioner would not been convicted of voluntary manslaughter. Consequently, this court should

9    issue a writ.

10        ## 2. The trial court violated petitioner's right to a fair trial when it
        refused permit petitioner to admit evidence of Narrowing's gang membership.

11

12        The right to a meaningful opportunity to present a complete defense is guaranteed by the

        Sixth Amendment as well as in the Fourteenth Amendment due process right to a fair trial. *Crane*

13      *v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986), *Rock v. Arkansas,*

14      483 U.S. 44, 52, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987). The constitution guarantees that the

15      defendant's version of the facts must be presented to the jury as well as the prosecutor's version.

16      *Washington v. Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). Defense

17      evidence may not be excluded from the jury based on a mechanistic application of state rules of

18      evidence. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973),

19      *Olden v. Kentucky* (1988) 488 U.S. 227, 232-33, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988),

20      *United States v. Hayat*, 710 F.3d 875, 898 (9th Cir. 2013), *Ortiz v. Yates*, 704 F.3d 1026, 1036

21      (9th Cir. 2012.)

22        The exclusion of evidence proffered by the defense may violate the defendant's Fifth and

23      Sixth Amendment rights to present a defense, the Sixth Amendment right to confront and cross-

24      examine, and the due process clause of the Fourteenth Amendment. The Constitution guarantees

25      criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. South*

26      *Carolina,* 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006), quoting *Crane v.*

27

28                                          m-8

1    *Kentucky*, 476 U.S. at 690, *Washington v. Texas*, 388 U.S. at 19. Accord, *United States v. Hayat*,

2    710 F.3d at 898, *Jackson v. Nevada*, 688 F.3d 1091, 1106 (9ᵗʰ Cir. 2012), *Chi v. Cambra*, 360

3    F.3d 997, 1003, 1006 (9ᵗʰ Cir. 2004), *Alcala v. Woodford*, 334 F.3d 862, 877 (9ᵗʰ Cir. 2003),

4    *Depetris v. Kuykendall*, 239 F.3d 1057, 1062 (9ᵗʰ Cir. 2001), *LaJoie v. Thompson* 217 F.3d at

5    668, *Franklin v. Henry* (9ᵗʰ Cir. 1997) 122 F.3d 1270, 1273, *United States v. Peters*, 937 F.2d

6    1422, 1424 (9ᵗʰ Cir. 1991), *United States v. Lopez-Alvarez*, 970 F.2d 583, 587 (9ᵗʰ Cir. 1992).

7        The Fifth Amendment to the United States Constitution provides that no person shall "be

8    deprived of life, liberty, or property without due process of law . . . ." Similarly, the Fourteenth

9    Amendment prohibits any state from depriving a person of liberty without "due process of law."

10   The Fourteenth Amendment prohibits states from "depriv[ing] any person of life, liberty, or

11   property, without due process of law . . . ." The due process right to a fair trial is a fundamental

12   liberty secured by the Fourteenth Amendment. *Estelle v. Williams*, 425 U.S. at 504.

13       Restriction on defense cross-examination can violate a defendant's Sixth amendment

14   right to confrontation:

15       "Cross-examination is the principal means by which the believability of a witness
     and the truth of his testimony are tested. Subject always to the broad discretion of

16   a trial judge to preclude repetitive and unduly harassing interrogation, the cross-
     examiner is not only permitted to delve into the witness' story to test the witness'

17   perceptions and memory, but the cross- examiner has traditionally been allowed
     to impeach, i.e., discredit, the witness."

18   *Davis v. Alaska*, 415 U.S. 308, 316-17, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974), *Olden v.*

19   *Kentucky*, 488 U.S. at 232-33. Accord, *United States v. Larson*, 495 F.3d 1094, 1103-04 (9ᵗʰ Cir.

20   2007), *Slovik v. Yates*, 556 F.3d 747, 752, 755 (9ᵗʰ Cir. 2009), *Fowler v. Sacramento County*

21   *Sheriff's Department*, 421 F.3d 1027,1041-1042, (9ᵗʰ Cir. 2005), *United States v. Schonenberg*,

22   388 F.3d 1275, 1279 (9ᵗʰ Cir. 2004), *United States v. Adamson*, 291 F.3d 606, 613-614 (9ᵗʰ Cir.

23   2002).

24       The right to present a defense is grounded in the Fifth and Sixth Amendments. *LaJoie v.*

25   *Thompson* 217 F.3d 663, 668 (9ᵗʰ Cir. 2000), *Crane v. Kentucky*, 476 U.S. at 690. The exclusion

26   of this evidence deprived petitioner of his Sixth Amendment right to present a defense.

27

28       m-9

Because of the implication of petitioner's rights under the Sixth and Fourteenth Amendments to the United States Constitution that flow from this error in unduly restricting cross-examination, this error calls for reversal unless the prosecution can establish beyond a reasonable doubt that the error was harmless. *Chapman v. California,* 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), *Delaware v. Van Arsdall,* 475 U.S. 673, 678-79, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986; *Olden v. Kentucky,* 488 U.S. at 232-33.

> 3. The trial court's limitations on the use of the self-defense instruction violated petitioner's constitutional right to present a defense and have the jury determine every material issue presented by the evidence, as guaranteed by the Fifth, Sixth and Fourteenth Amendments, and lightened the prosecution's burden of proof in violation of the due process clause and requirement of proof beyond a reasonable doubt guaranteed by the Fifth and Fourteenth Amendments.

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina,* 547 U.S. at 324, *quoting Crane v. Kentucky,* 476 U.S. at 690. *Accord, Lunberry v. Hornbeak,* 605 F.3d 754, 790 (9th Cir. 2010), *United States v. Larson* 495 F.3d at 1103-1104, *Chia v. Cambra,* 360 F.3d at 1003, 1006, *Alcala v. Woodford,* 334 F.3d at 877, *Depetris v. Kuykendall,* 239 F.3d at 1062, *LaJoie v. Thompson,* 217 F.3d 663 at 668 (9th Cir. 2000).

To convict petitioner of murder, the jury had to find beyond a reasonable doubt that he acted unlawfully and with malice. Because the court refused instruction on voluntary manslaughter on a heat of passion theory, the only defense theories petitioner was permitted to present to the jury were self defense and imperfect self defense.

The court gave the standard CALCRIM instructions, 505 on perfect self defense (CT. vol. 6, p. 1578-1579) and 571 on imperfect self defense. (CT. vol. 6, p. 1584.) It also instructed with CALCRIM 3471 on the effect of mutual combat or being the initial aggressor on the right to use self defense, (CT. vol. 6, p. 1581), and with CALCRIM 3472, that the right to use self defense may not be contrived. (CT. vol. 6, p. 1582.)

Defense counsel argued that it was error to instruct with CALCRIM 3471 and 3472 because they are not supported by the evidence. The factual basis supporting each of them would

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities

1   be essentially the same in this case, and the evidence herein supports neither. There was no

2   evidence that he engaged in mutual combat prior to Naranjo's beginning the shooting incident

3   on the patio. Neither is there substantial evidence that he personally provoked the fight or

4   quarrel which led to the shooting.

5       The prosecutor used these instructions to urge the jury to reject the only defense theories

6   that it had been permitted to argue after he succeeded in precluding a heat of passion voluntary

7   manslaughter instruction. These instructions lightened the prosecutor's burden of proof to

8   establish each element of the crime of murder beyond a reasonable doubt in violation of the

9   Sixth and Fourteenth Amendments. *Yates v. Evatt,* 500 U.S. 391, 404 n.9,111 S. Ct. 1884, 114

10  L. Ed. 2d 432 (1991), *Carella v. California,* 491 U.S. 263, 265, 109 S. Ct. 2419, 105 L. Ed. 2d

11  218 (1989), *Ulster County Court v. Allen* 442 U.S. 140, 157-163, 99 S.Ct. 2213, 2224-2227,

12  60 L.Ed.2d 777 (1979), *Franklin v. Francis,* 471 U.S. 307, 314-15, 105 S.Ct. 1965, 1971, 85

13  L.Ed.2d 344 (1985), *Patterson v. New York* 432 U.S. 197, 210, 97 S. Ct. 2319, 53 L. Ed. 2d 281

14  (1977), *Cool v. United States*, 409 U.S. 100, 104, 93 S. Ct. 354, 34 L. Ed. 2d 335 (1972), *Conde*

15  *v. Henry,* 198 F.3d at 741, 739, *Martinez v Garcia*, 379 F.3d 1034, 1038 (9th Cir. 2004), *Stark*

16  *v. Hickman,* 455 F.3d 1070, 1077 (9th Cir. 2006), *Gibson v. Ortiz*, 387 F.3d 812, 820 (9th Cir.

17  2004), *Martinez v. Borg*, 937 F.2d 422, 423 (9th Cir. 1991), *Hanna v. Riveland* 87 F.3d 1034,

18  1037 (9th Cir. 1996).

19      The prosecutor relied on these instructions to argue that the jury should reject self

20  defense.

21      "When we talk about the law of self defense you will find that it is an extremely
    limited right. And among the things you don't get to do is get into a fight knowing
22      and seeking the opportunity to use deadly force. And this defendant, for whatever
    reason, was looking for trouble from the beginning that night. I mean, I suggest
23      ot you that there is absolutely no believable contradictory evidence. ... and that
    alone includes (sic) self defense, you're done with self defense when you find and
24      accept that as a fact. We're done."

25  (RT. vol. 25, p. 2269-2270.)

26      While he admitted that he could not prove that petitioner shot first, he argued that even

27  if petitioner only joined the fight after Naranjo shot Mendes, when petitioner deliberately joined

28                                          m-11

1  the fight, he could not claim self defense because no one had shot at him before that time. (RT.
2  vol. 25, p. 2271.)

3       Petitioner argued below that this was an inappropriately stingy version of the right to use
4  self defense by someone who is present, observing, but not participating in a fight among other
5  people, who begins to fire only after another party begins shooting and kills someone. Petitioner
6  was not an "initial aggressor" nor was he engaged in mutual combat prior to the time he began
7  shooting. The Court of Appeal found that the fact that petitioner arrived with a gun at the bar,
8  was loud and obnoxious and was intoxicated, supported an inference that the man who did
9  initiate contact with the other group was an emissary from petitioner and his companions. It also
10  found any error to be harmless. (Slip op., pp. 18-19.) Petitioner submits that review should be
11  granted because this analysis of the facts and the requirements for mutual combat is completely
12  incorrect under existing precedent of this court. There is absolutely no evidence that petitioner
13  ever spoke to Naranjo or challenged him or anyone else in Hernandez's group prior to Naranjo
14  starting to shoot and killing petitioner's friend.

15       Although the jury rejected the prosecutor's most extreme argument that these were first
16  degree murders, its verdict of second degree murder must be considered to have relied upon
17  provocation. The restrictions on self defense which were not supported by the evidence
18  improperly deprived petitioner of his ability to contest whether the prosecutor had met its
19  burden of proof of malice or to show that this was unjustified homicide in reasonable self
20  defense.

21       The court failed to explain the meaning of mutual combat in self defense. *People v. Ross*
22  (2007) 155 Cal.App.4th 1033, 1036, defined mutual combat as "a violent confrontation
23  conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to
24  fight." In the absence of such an agreement, the court found that the defendant was entitled to
25  a determination whether he acted in self-defense and reversed the judgment under the non-
26  constitutional standard of harmless error.

27       Thus, in the context of self defense, mutual combat does not simply mean that the

28                                                        m-12

1  combatants want to fight or that both parties actually engage in a fight. Such a construction
2  would deprive a person attacked of acting to defend himself without first trying to avoid combat,
3  and would cause the right to defend oneself to be forfeited by using it. *People v. Ross* 155
4  Cal.App.4th at 1044. The doctrine requires that there be a preexisting intent to engage in
5  combat followed by a mutual exchange of blows. Once a blow has been struck, the fact that it
6  might make the other party want to fight does not create mutual combat. *People v. Ross,* 155
7  Cal.App.4th at 1045.

8      While *People v. Ross* acknowledged that there might be situations in which gangs are
9  involved where mutual combat could be inferred from violent interactions of rival gangs. *People*
10 *v. Ross*, 155 Cal.App.4th at at 1046 and fn. 16, in this case the prosecutor was adamant and the
11 court agreed that this was not gang motivated and excluded almost all evidence related to gangs.
12 There was never any indication that petitioner and his friends were part of a gang with a
13 predisposition to engage in combat or with any previous hostility with the Hernandez group.
14 There was no evidence of any on-going animosity between petitioner and his group and
15 Hernandez's group. The evidence showed only that the incident began when a man in the gray
16 sweatshirt and Hernandez had a verbal altercation on the dance floor. Nothing implicated
17 petitioner in any involvement or instigation of that incident. Thus the evidence does not support
18 restricting petitioner's right to self defense based on his being an aggressor or involved in any
19 mutual combat. Petitioner's response to Naranjo's shooting cannot deprive him of the right to
20 use self defense.

21     The improper instructions, combined with the reliance by the prosecutor on this theory
22 was extremely prejudicial especially once the court had precluded him from presenting heat of
23 passion as an alternative theory of voluntary manslaughter to the jury.

24     Because the improper instruction undermined the jury's understanding of his right to use
25 self defense, perfect or imperfect, and because to establish the element of malice for murder, the
26 prosecutor must prove beyond a reasonable doubt that he did not act in self defense, this was
27 federal constitutional error subject to the harmless beyond a reasonable doubt standard.

28

m-13

1 | *Chapman v. California,* 386 U.S. at 24.

2 | **4. Conclusion**

3 | For the above reasons, petitioner respectfully requests that this Court issue a writ of

4 | habeas corpus.

5 | Dated: Oakland, California, Monday, May 20, 2013.

6

7

8

9

Robert J. Beles
Paul McCarthy
Attorneys for *Petitioner* ROLANDO FERNANDEZ

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28 | m-14

Petition for Writ of Habeas Corpus; Verification; Memorandum of Points and Authorities