UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROLANDO FERNANDEZ,

       Plaintiff,

   v.

W L MONTGOMERY,

       Respondent.

Case No.  13-cv-02296-HSG

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Re: Dkt. No. 27

     Before the Court is Petitioner Rolando Fernandez's ("Petitioner") second-amended petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court.  Dkt. No. 27 ("Pet.").  Respondent W.L. Montgomery, Warden of California State Prison - Calipatria, ("Respondent") has filed an answer, Dkt. No. 28 ("Ans."), and Petitioner has filed a traverse, Dkt. No. 32 ("Trav.").  The Court has carefully considered the briefs submitted by the parties.  For the reasons set forth below, the petition is **DENIED**.

**I.     PROCEDURAL HISTORY**

     In 2007, a California jury found Petitioner guilty of two counts of second-degree murder, *see* Cal. Pen. Code § 187(a), with a sentencing enhancement for intentional discharge of a firearm causing death, *id.* § 12022.53(d).  Pet. ¶ 1.  The prosecution also sought to prove that Petitioner was previously convicted of murder, a finding which results in a mandatory penalty of death or life imprisonment without the possibility of parole, but the jury found that allegation untrue.  Pet. ¶¶ 1, 4.  Petitioner was sentenced to a term of 80 years to life, less time served.  *Id.* ¶ 8.

     Petitioner directly appealed the conviction in the California Court of Appeal, alleging several constitutional and state law errors.  *Id.* ¶ 10.  In a reasoned opinion, the California Court of Appeal affirmed.  *Id.*  The California Supreme Court summarily denied review.  *Id.* ¶ 11.

United States District Court
Northern District of California

The original petition in this case was filed in this Court on May 20, 2013. Dkt. No. 1. An answer was filed on March 20, 2014. Dkt. No. 5. Petitioner filed a traverse on June 20, 2014. Dkt. Nos. 14 & 15. On June 24, 2014, Petitioner filed a motion to stay the petition and hold it in abeyance to permit exhaustion of a claim he raised for the first time in his traverse. Dkt. No. 16. The Court issued an order requiring Petitioner to clarify the procedural mechanism by which he desired to proceed with respect to his new claim. Dkt. No. 17. Petitioner reaffirmed his choice and again moved to amend and stay the petition on August 20, 2014. Dkt. No. 20. The Court granted the motion and stayed the petition on September 24, 2014. After the state court appellate decision that formed the basis for the new claim was reversed, the Court dissolved the stay and reinstated proceedings on May 29, 2015, on motion from Petitioner. Dkt. Nos. 24, 26.

Petitioner filed the instant amended petition on June 4, 2015. Respondent filed an answer on July 6, 2015, and Petitioner filed a traverse on September 4, 2015.

## II.    STATEMENT OF FACTS

The following background facts describing the crime and evidence presented at trial are from the opinion of the California Court of Appeal.[1]

### *Prosecution Case*

Bartender Ana Lilia Cardenas saw her friend Ignacio "Chano" Mendes arrive at the Headquarters Bar a few minutes after 6:00 p.m. on Friday, April 14, 2006. Mendes was accompanied by another man wearing a gray hooded sweater who she had seen with Mendes five or six times. Defendant's cousin, Ruben Ramos, joined them, and defendant arrived later and also joined the group. The men were all from the same part of Mexico. As the evening wore on, Mendes and his friends became more intoxicated.

Angelica Cervantes was at the bar that evening with several friends, including Jesus Hernandez. The group drank and danced until a man in a gray hooded sweater tapped Hernandez on the shoulder and made a gesture for him to go outside to the patio. It did not seem to Cervantes like a friendly gesture, but she could not hear what they were saying. Cervantes had noticed a group of about five men at another table staring at them earlier. The man in the hooded sweater was one of them. He and Hernandez walked out onto the patio.

---

[1] This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135, n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1). Footnotes set forth within this summary are from the summary.

United States District Court
Northern District of California

Juana Alvarez, Hernandez's girlfriend, was also at the bar that night. She also noticed a group of men staring at them. When Hernandez went outside with the man with the hooded sweater, she followed them to the patio. Alvarez saw the man in the hooded sweater try to provoke Hernandez into a fight. Hernandez appeared angry, but he did not fight the man. Hernandez got up and made a phone call. When he was done with the call, the man in the hooded sweater approached them and said, "I'm sorry, that's your girl, I didn't mean to disrespect." Hernandez and Alvarez returned to their table. Hernandez ordered a beer. As he was ordering, Humberto Calderon arrived at the bar with a group of other men. Cervantes thought there were 10 guys with him. Alvarez saw maybe three others with him. Calderon spoke with Hernandez and then they walked over to the man in the hooded sweater and signaled for him to come outside. They all went out to the patio. Alvarez saw a total of 10 or 15 men from both groups go out to the patio. A few minutes after they went out, Cervantes and Alvarez could hear gun fire.

Ramos and Mendes went outside together. Right after they stepped through the door, Ramos heard shooting. Ramos saw one shooter in each group. He did not see a gun in defendant's hand, but he saw the flame from a gun. Ramos did not recall telling the police he saw defendant with a gun shooting at a "cholo." When he turned to run inside, Ramos saw Mendes had been shot and was lying face down on the ground.

Ramon Arreola, whose uncle owned the Headquarters Bar, was also there that night. He knew Mendes and greeted him after he arrived. He had seen defendant in the bar before and recognized him. Arreola stopped a loud argument that developed outside the bathroom that night and afterward defendant came up to him and told him, "Don't worry, if there's trouble I got your back."

Arreola was outside on the patio when he heard gunshots. He tried to take cover behind a walk-in refrigerator on the patio. He saw defendant standing near the door to the bar shooting a handgun. Defendant was shooting in the direction of a locked gate door leading from the patio to a parking lot. Two people were standing there at the gate. He fired about 15 shots at the two people who were about eight feet from him. They were "raising their hands, trying to turn away, kind of jumping up and down in a slow motion." They appeared to be trapped in the corner by the gate and neither of them had a gun. Arreola did not see anyone else on the patio with a gun and no one was shooting at defendant. When the firing stopped, Arreola ran into the bar and through it to get to his car parked outside on the street.

Angel Jimenez was on the patio having a cigarette when two groups of people lined up on either side of him to fight. Jimenez knew a lot of the people in one of the groups as people from the neighborhood, including his friend Jesus Hernandez. One of the groups were "pisas," meaning fellow natives of Mexico. Jimenez thought there were about 10 people in each group. One of the pisas approached Hernandez and said he had been disrespected by one of Hernandez's friends. A fight broke out between Humberto Calderon and one of the pisas. When another pisa hit Calderon, everybody started fighting. Thirty or forty seconds later, Jimenez heard gunshots. Jimenez saw defendant in front of him shooting toward the fence. Defendant walked forward as he fired his gun and deliberately aimed at the gate. He did not try to duck or conceal himself as he was walking toward the gate and shooting. Defendant was the only person firing.

Jimenez ran into the ice machine closet for cover. The closet was the size of an average bathroom. He heard six or seven more gunshots as he hid, all coming from one gun. Jimenez saw defendant again when he stepped into the ice machine closet with a gun in his hand. He was two or three feet from Jimenez. Defendant looked at Jimenez and pointed the gun at him. Jimenez said to him in Spanish, "[W]ow, man, I didn't do nothing." At that point, defendant shuffled through his pockets, pulled out a clip of bullets, and reloaded his gun. He worked the action on the gun, held it up, and left the closet with his arm outstretched and his finger on the trigger. He fired two more rounds at the gate. The last two shots were fired with an appreciable pause in between.[2]

When the sound of gunfire stopped, Jimenez left the ice machine closet. He saw his friends, Jesus Hernandez and Humberto Calderon, on the ground by the gate. Hernandez was dead and Calderon was dying. Neither man had a gun or other weapon, and there was no sign either had ever been armed. As he exited through the bar, Jimenez noticed defendant holding the body of Mendes and calling his name. He was surprised to see defendant was still there after he had killed two people.

Hernandez and Calderon died from multiple gunshot wounds. Hernandez was shot three times, including a fatal shot to the back of the head. Hernandez had a blood alcohol level of .02 percent, the equivalent of one beer. No drugs were detected in his bloodstream. Calderon was 18 years old at the time of his death. He was shot five or six times in the neck, leg, and buttock. Calderon died from a combination of all of his injuries. His blood alcohol level was .07 percent or the equivalent of three and a half drinks.

### Defense Case

Michael Bass and Domingo Naranjo were at birthday party for Calderon when Calderon got a call and told them they had to go to the Headquarters Bar to help Hernandez.[3] After arriving at the bar, Bass followed people outside to the patio. A fight broke out and Bass joined in. Calderon was involved along with some other people Bass did not know. Almost immediately, Bass heard gunshots close by. Bass immediately ran toward the fence and jumped over it. As he was running down the street, he saw Naranjo driving the car they had used to get to the bar. Bass called out, and Naranjo stopped to pick him up. Naranjo had been shot. He later admitted to Bass he had been shooting that night.[4]

Nabila Alvarez was at the bar with a group of friends including Camillo Serrano. She saw an argument between two men near where she was sitting and then saw several people rush out to the patio. A few minutes later she heard numerous gun shots. When she heard the

---

[2] The measured distance between the ice machine closet and the gate was 21 feet. At that distance, in the lighting conditions that existed on the patio at the time of the shootings, defendant would have been able to clearly see the people who were standing at the gate.

[3] Bass's grand jury testimony was read to the jury because he invoked his Fifth Amendment rights at trial and the prosecutor refused to grant him immunity.

[4] Naranjo was charged jointly with defendant for the murders of Hernandez and Calderon, and was charged in addition with the murder of Mendes and assault with a firearm on Camillo Serrano. Before trial, he entered a negotiated plea to one count of voluntary manslaughter with a weapon use enhancement, and was sentenced to 21 years in prison.

first shots, she turned toward the sound and saw Serrano holding his stomach and realized he had been shot.  She went to help him and had to step over another man who was lying on the floor.

Claudia Alvarez was at the bar with several friends.  About 1:00 a.m. she went to the patio with Serrano to have a cigarette.  A fight was in progress when they arrived.  She saw Naranjo pull a gun and heard shots fired.  She did not see another gun.  When the shooting started she ran inside and tripped over a body on the floor.

Defendant testified on his own behalf.  He was 26 years old at the time of the shootings and lived in San Jose with his wife and two daughters.  He had known Mendes for a couple of years and they were close friends.  Ruben Ramos is his cousin.  He met the two men at Headquarters Bar between 9:00 p.m. and 10:00 p.m. on April 14, 2006.  He was carrying a gun for protection that night because he was getting death threats stemming from money he owed on a drug deal that had gone bad in 2005.  He had previously sold heroin as well as marijuana.

Between 10:00 p.m. and 1:00 a.m., defendant drank about 10 bottles of Corona and three Remy Martins.  He also used cocaine or methamphetamine about 12:30 a.m.  There were several people at the bar who he thought were Norteño gang members.  He could tell from the way they dressed and acted.  They were dancing and getting aggressive.  Close to 1:00 a.m., defendant saw a bunch of people run outside to the patio.  He went out to the patio to see what was going on.  He saw a bunch of Norteños out there who seemed to be arguing.  He walked closer looking for Mendes and Ramos.  He saw Mendes hit someone on the side of the head and assume a fighting position.  Immediately, shots started going off.  He heard two or three shots and began firing back toward the area where the gunfire originated.[5]  The person who was firing was moving toward the gate.  Defendant was really scared and thought he was "being hit."  He did not know who was shooting at him, but thought he was a Norteño because of his clothing.  His gun jammed and as he was trying to clear it, he saw two people running towards him and firing.  He cleared the jam, fired the rest of his clip back at them, and ran toward the ice machine to reload.  He could not leave because a lot of people were still trying to go through the door from the patio back into the bar.  While he was reloading he continued to hear shots.  Defendant saw a Norteño in the ice machine room, but he did not shoot him because the man did not threaten his life.  He was scared the whole time.  He panicked and thought he had been shot.  Because he had never been shot before all he wanted to do was to protect himself from the individuals who were shooting at him.

Defendant left the ice machine closet and ran for the exit, firing two or three more shots—without looking—toward the gate where the people standing in line.  Inside the bar, he saw Mendes on the floor.  He tried to help, but left as more Norteños came in asking what had happened.  There were cars packed with Norteños arriving as he left.  When defendant noticed emergency lights behind him as he was speeding away from the bar, he became confused and thought Norteños were chasing him.  He did not stop for the police and eventually crashed his car.  He tossed his gun across the street and threw an

---

[5] Defendant admitted he first told police Mendes was the one who fired the gun that night.

extra clip into the backyard behind him.  He threw the gun away so the police would not shoot him.  He lied to them when they asked him if he had a gun.

A criminalist testified he found particles consistent with gunshot residue on Calderon's and Hernandez's hands.  He concluded the victims may have either discharged a firearm or otherwise had their hands in an environment of gunshot residue.  The criminalist noted gunshot residue might be found on a person who was located within two and a half feet in any direction of a firearm being discharged, or within 14 feet if the person was located in the muzzle direction.  It was not uncommon for shooting victims to have gunshot residue on them.

Defense expert, Dr. Phillip Trompetter, was a clinical psychologist who specializes in police officer reactions during deadly force confrontations.  He described common perceptual distortions that can occur during such encounters where even trained police officers react in unexpected ways. Studies have found between 17 and 38 percent of officer-involved shootings are based on mistakes of fact.  Lighting conditions and the stress of a deadly force confrontation lead to confusion and distortions.  Even trained officers can have a delay in registering that a threat no longer exists and will keep shooting past the time the danger has ceased.  A person takes about one and a quarter seconds to fall after being fatally shot, which may cause the shooter to keep firing even after firing a fatal shot.

*People v. Fernandez*, No. A123247, 2011 WL 5865063, at **1-5 (Cal. App. Ct. Nov. 22, 2011).

## III.    DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996.  This Court may entertain such a writ petition "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.

28 U.S.C. § 2254(d)(1) restricts the source of "clearly established" law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  Because the California Supreme Court summarily denied Petitioner's state habeas petition, the California Court of Appeal, in its opinion on direct review, was the only state court decision that addressed the three claims petitioner raises in the instant petition.  The Court thus reviews the decision of the court of appeals, the highest state court to have reviewed the claims in a reasoned decision.

## B. Petitioner's Claims

Petitioner pursues three claims on federal habeas review.  First, Petitioner claims that the state court erred by refusing to instruct the jury, upon Petitioner's request, as to the lesser-included offense of voluntary manslaughter on the basis of heat of passion caused by a sudden quarrel. Pet., Memorandum of Points and Authorities ("Mem.") at 1-8.  Second, Petitioner claims that the

1   state court improperly excluded evidence of Naranjo's gang membership, which undermined his

2   theory of self-defense in support of voluntary manslaughter.  *Id.*, Mem. at 9-17.  Third, Petitioner

3   claims that the state court improperly instructed the jury, over Petitioner's objections, as to perfect

4   and imperfect self-defense and mutual combat, which lightened the prosecution's burden of proof.

5   *Id.*, Mem. at 14-17.  The Court addresses each of Petitioner's claims in turn.

6          1.     Denial of Heat-of-Passion Jury Instruction

7                 a)     *Background*

8          Under California law, murder is defined as "the unlawful killing of a human being . . . with

9   malice aforethought."  Cal. Pen. Code § 187(a).  "Malice" exists "when there is manifested a

10  deliberate intention unlawfully to take away the life of a fellow creature," "when no considerable

11  provocation appears" or "when the circumstances attending the killing show an abandoned and

12  malignant heart."  *Id.* § 188.

13         Manslaughter is defined as "the unlawful killing of a human being without malice" and is

14  deemed voluntary when "upon a sudden quarrel or heat of passion," *id.* § 192(a), or when the

15  perpetrator "kills in 'unreasonable self-defense—the unreasonable but good faith belief in having

16  to act in self-defense,'" *People v. Rios*, 23 Cal. 4th 450, 460 (2000) (quoting *People v. Breverman*,

17  19 Cal. 4th 142, 153-54 (1998)).  "These mitigating circumstances reduce an intentional, unlawful

18  killing from murder to voluntary manslaughter by *negating the element of malice* that otherwise

19  inheres in such a homicide."  *Id.* at 461 (internal quotations omitted; italics original).  Because a

20  person who kills unlawfully and intentionally, but lacks malice, is guilty of voluntary

21  manslaughter, voluntary manslaughter is a lesser-included offense of murder.  *Id.*

22         "[T]he factor which distinguishes the 'heat of passion' form of voluntary manslaughter

23  from murder is provocation."  *People v. Lee*, 20 Cal. 4th 47, 59 (1999).  "The provocation which

24  incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or

25  be conduct reasonably believed by the defendant to have been engaged in by the victim."  *Id.*

26  (internal citation omitted).  "[T]he conduct must be sufficiently provocative that it would cause an

27  ordinary person of average disposition to act rashly or without due deliberation and reflection."

28  *Id.*  Because the test for provocation is objective, a defendant's intoxication is irrelevant.  *Id.* at 60.

United States District Court
Northern District of California

United States District Court
Northern District of California

At trial, Petitioner requested the standard voluntary manslaughter instruction, CALCRIM No. 570,[6] relating to sudden quarrel or heat of passion, as well as CALCRIM No. 522,[7] relating to the effect of provocation in reducing the degree of murder. Pet. ¶ 56. He argued the shooting was provoked by the actions of Naranjo as well as by Hernandez and Calderon. *Id.* The trial court gave CALCRIM No. 522, but deleted the bracketed portions that referred to provocation reducing murder to manslaughter, and refused to give CALCRIM 570 altogether. *Id.* The trial court found no factual basis to instruct as to provocation because "the fact that Mr. Naranjo allegedly provoked [Petitioner] by allegedly shooting first for public policy reasons does not allow [Petitioner] to shoot two other people and in my view of [Petitioner's] testimony and the different versions of his explanation for what he was doing at the Headquarters Bar there was no claim that he ended up shooting [the two victims] because he was provoked to do so." *Id.* ¶ 57. In other words, the trial court found that there was no factual basis to instruct as to heat of passion because of a sudden quarrel in light of Petitioner's testimony that he shot the victims in self-defense. *Id.*

Petitioner contends that it was constitutional error for the state court to refuse to instruct the jury as to voluntary manslaughter on a theory of heat of passion caused by a sudden quarrel. This argument largely parallels the position he took before the California Court of Appeal, which the state court summarized and discussed as follows:

> Defendant argues the following facts and evidence warranted a heat of passion instruction: (1) a large, aggressive group defendant perceived to be wearing gang clothing came to the bar in response to a call from one of the shooting victims; (2) the incident happened quickly; (3) defendant testified 20 of the group members were beating up on Ramos; (4) Naranjo, a member of the group, shot first and the scene immediately became chaotic; (5)

---

[6] CALCRIM No. 570 provides in relevant part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if: 1. The defendant was provoked; 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; AND 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."
[7] CALCRIM No. 522 provides: "Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide. If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.][.]"

United States District Court
Northern District of California

defendant felt scared, thought he had been shot, and panicked because he had never been shot at before; and (6) according to defendant's expert, Dr. Trompetter, even trained police officers experience confusion and distortion in a sudden confrontation, causing them to misperceive the danger.

[ . . . ]

Defendant principally relies on the facts of [*People v. Breverman*, 19 Cal. 4th 142, 162 (1998)] to establish the sufficiency of his evidence to support the requested voluntary manslaughter instruction. *Breverman* arose from the following facts: "Two young men . . . walking by defendant's house got into a fight with a larger group of youths congregated in the driveway. The two sustained cuts and bruises before the fracas ended . . . . The next night, at least one of the pair returned with a group of friends . . . . Members of the group taunted defendant, then used a baseball bat and other implements to batter his automobile, which was parked in the driveway near his front door. Defendant fired several shots through a window pane in the front door, then came outside and fired further shots toward the fleeing vandals. One bullet from this second volley fatally wounded a member of the group." (*Breverman*, *supra*, 19 Cal.4th at p. 148.) The defendant was charged with murder, and the jury was instructed on reasonable self-defense, the permissible use of force to resist a violent domestic intruder, and voluntary manslaughter arising from an unreasonable belief in the need for self-defense. (*Id.* at p. 152.) The issue on appeal was whether the trial court erred by failing *sua sponte* to instruct on heat of passion voluntary manslaughter. (*Ibid.*)

In discussing the evidence supporting that theory, the Supreme Court stated: "[T]here was evidence that a sizeable group of young men, armed with dangerous weapons and harboring a specific hostile intent, trespassed upon domestic property occupied by defendant and acted in a menacing manner . . . . Defendant and the other persons in the house all indicated that the number and behavior of the intruders, which defendant characterized as a 'mob,' caused immediate fear and panic. Under these circumstances, a reasonable jury could infer that defendant was aroused to passion, and his reason was thus obscured, by a provocation sufficient to produce such effects in a person of average disposition." (*Breverman*, *supra*, 19 Cal.4th at pp. 163–164, fn. omitted.) The court also found it critical that the defendant was faced with "a large, armed, and clearly hostile group of men, who, [he] had reason to suspect, were seeking revenge for the incident of the previous evening," and "feared the intruders intended to force their way into the residence." (*Id.* at p. 164, fn. 11.)

The facts here are distinguishable from those in *Breverman*. The confrontation occurred in a public place, not at defendant's home, and the alleged provocation for defendant's conduct was of an entirely different nature. According to defendant's account, he had no interaction with Hernandez and his friends until the moment fighting broke out. He had merely noticed them toward the end of the evening and thought they were acting in an aggressive manner on the dance floor and might be Norteños. By defendant's account, he followed a crowd outside to the patio to see what was happening, and saw a fight break out between his companions, Ramos and Mendes, and Hernandez's friends. He did not describe any emotion he had at seeing that. In fact, by his own account, he did not have time to react because two or three shots rang out almost immediately, before he could even join the fight. He testified the shots were "[r]eally close, they were shooting at us." That

was the moment when, by his account, defendant first felt personally menaced. When asked what happened after he heard the shots, defendant responded, "I started shooting back." Thus, the only provocation defendant testified to for bringing out his own loaded gun and starting to shoot round after round at Hernandez and Calderon was his perception that they were shooting at him.

These are not like the facts in *Breverman*. The defendant in that case described a growing menace and terror as a vengeful, armed mob trespassed on his property, challenged him to fight, battered his car, and seemed to be about to force its way into his house. (*Breverman*, 19 Cal.4th at pp. 163–164 & fns. 11, 12.) There was no such build-up or preamble here. Defendant did not say he began shooting out of a sudden boiling over of anger, rage, or distress at anything the victims or their friends had done up to the moment when the shooting began. As he describes them, his emotions were focused on the fear of being shot or killed. He said he felt fear and panic when the shots were fired. When asked what he was scared of, defendant responded, "I thought I was being hit." Asked what was "going on in [his] head" as he was firing his weapon, defendant responded: "I was very scared, I panicked, I never been shot before, my thing was to protect myself from the individuals that were shooting at me." (Italics added.) Asked why he did not go after the Norteño he found standing next to him in the ice machine alcove, defendant explained, "He didn't threaten my life. He didn't try to take my life away." It is hard to find anything of substance in defendant's account of himself that would not, if credited by the jury and corroborated by other evidence, support a claim of justifiable homicide based on reasonable self-defense. If that was the case, he was not entitled to an instruction on heat of passion voluntary manslaughter. (*See People v. Wickersham* (1982) 32 Cal.3d 307, 327–328 [court should not instruct on heat of passion voluntary manslaughter where the same facts would give rise to a finding of reasonable self-defense], *overruled on another point in Barton*, *supra*, 12 Cal.4th at p. 201.) Defendant's testimony he felt fear and panic about being shot at, without more, is too insubstantial to support a heat of passion voluntary manslaughter instruction.

We find this case is closer on its facts to *Moye* than it is to *Breverman*. The defendant in *Moye* was convicted of second degree murder for beating another man to death with a baseball bat. (*Moye*, *supra*, 47 Cal.4th at p. 540.) As in this case, the jury was instructed on reasonable self-defense and imperfect self-defense, which would have supported conviction for voluntary manslaughter. (*Ibid.*) Relying on his own testimony at trial about the circumstances of the beating, the defendant argued on appeal that the trial court erred in refusing a defense request for a further instruction on a heat of passion/sudden quarrel theory of voluntary manslaughter. (*Ibid.*)

According to the defendant, he and some friends drove up to the victim in order to talk to him about a fight they had both been involved in the night before, and patch things up. (*Moye*, *supra*, 47 Cal.4th at p. 545.) The victim kicked the defendant's car and ran off. (*Ibid.*) The defendant was upset and chased after the victim to see where he ran, allegedly so he could report him to the police. (*Ibid.*) When the defendant caught up with the victim, the victim smirked at him and threatened him with a bat he was holding in his hands, saying, """Yeah, now I got you.""" (*Ibid.*) The victim hit him several times with the bat on his arms and hands until the defendant was able to grab the bat away from him. (*Id.* at pp. 545–546.) The defendant struck the victim with the bat but the victim kept coming after defendant, so the defendant kept hitting him until he fell down. (*Id.* at p.

546.)  At that point, the defendant got scared and ran.  (*Ibid.*)  The defendant explained his state of mind during this event as follows: "'I, like, wasn't, like, in the right state of mind. I was worried about getting hit.  I didn't want to get beat down and possibly be killed, so I was just worried about getting hit.  And then when I got the bat from him, I was worried about getting hit again, because he kept coming at me.'" (*Id.* at p. 546.)

The Supreme Court affirmed the trial court's ruling, finding the evidence to support a heat of passion theory was insubstantial: "In the face of defendant's own testimony, no reasonable juror could conclude defendant acted "'"rashly or without due deliberation and reflection, and from this passion rather than from judgment . . .'" [citations]' . . . . Although defendant did testify he was not in a 'right state of mind' when Mark . . . turned and attacked him after the chase, he immediately explained he was referring to his thought processes being caught up in the effort to defend himself from Mark. Defendant took great pains in his testimony to justify each blow he landed on Mark with the bat as a direct, defensive response to successive advances by Mark during his attack on defendant . . . . [¶] In short, the thrust of defendant's testimony below was self-defense—both reasonable self-defense (a complete defense to the criminal charges), and unreasonable or imperfect self-defense (a partial defense that reduces murder to manslaughter).  There was insubstantial evidence . . . to establish that defendant 'actually, subjectively, kill[ed] under the heat of passion.'" (*Moye*, *supra*, 47 Cal.4th at pp. 553-554.)

In our view, defendant's claim here has the same defect identified in [*People v. Moye*, 12 Cal. 4th 186 (1995)].  Everything he testified to points to self-defense, whether reasonable or unreasonable, and none of the testimony establishes that he killed actually, subjectively under the heat of passion.  Like the defendant's testimony in *Moye* that he was not in his right state of mind because he feared being hit and possibly killed, defendant's testimony here that he felt fear and panic about being shot at or losing his life is insufficient to support a heat of passion instruction. Defendant's reliance on *Breverman* is misplaced.  As the court stated in *Moye*: "Nothing in *Breverman* suggests an instruction on heat of passion is required in every case in which the only evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life." (*Moye*, *supra*, 47 Cal.4th at p. 555.)  Because a reasonable jury could not rely on the evidence defendant cites to find heat of passion voluntary manslaughter, no fundamental unfairness resulted from the trial court's refusal to instruct on that theory.  (*Ibid.*)

The trial court did not err in declining to instruct the jury on heat of passion voluntary manslaughter.

*Fernandez*, 2011 WL 5865063, at **5-9.

                b)    *Analysis*

As an initial matter, to the extent Petitioner argues that the state court misapplied state law to prejudicial effect, that claim is not cognizable on federal habeas.  The Supreme Court has "stated many times that federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (internal quotation omitted).  Both the Ninth Circuit and

1    courts in this district have held that this applies to the failure to provide requested jury instructions

2    in a manner a petitioner argues violated state law.  *See, e.g.*, *Menendez v. Terhune*, 422 F.3d 1012,

3    1029 (9th Cir. 2005) ("Any error in [a] state court's determination of whether state law allowed

4    for an instruction . . . cannot form the basis for federal habeas relief."); *Gibson v. Lizarraga*, No.

5    14-cv-03717, 2016 WL 310145, at *10 (N.D. Cal. Jan. 26, 2016) ("[A] state court's determination

6    that as a matter of state law, there was insufficient evidence to warrant the requested jury

7    instruction, should be the final word on the subject.") (internal quotation omitted).

8          Here, the state court found that, under state law, "[n]othing . . . suggests an instruction on

9    heat of passion is required in every case in which the only evidence of unreasonable self-defense is

10   the circumstance that a defendant is attacked and consequently fears for his life."  *Fernandez*,

11   2011 WL 586063, at *9 (quoting *People v. Moye*, 47 Cal. 4th 537, 555 (2009)).  Petitioner argues

12   at length that the state court misapplied *People v. Wickersham*, a California Supreme Court case

13   which held that state courts need not instruct on heat of passion where the facts give rise to a

14   finding of reasonable self-defense.  *See* 32 Cal. 3d 307, 327-328 (1982).[8]  Specifically, Petitioner

15   contends that the state court erred as a matter of state law by holding that not only was there no

16   substantial evidence to support a heat of passion instruction, but that *Wickersham* precluded that

17   instruction because the evidence supported only true self-defense.  To the extent Petitioner's claim

18   is based on this state law ground, it is denied as not cognizable on federal habeas review.

19          Petitioner also argues that "[t]he refusal or failure to instruct on the defendant's theory of

20   the case, including instructions on lesser offenses, violates the Sixth and Fourteenth Amendments

21   to the United States Constitution, the Sixth and Fourteenth Amendment right to a jury trial, and

22   the due process clause of the Fifth and Fourteenth Amendments to the United States Constitution."

23   Pet., Mem. at 1-2.  However, the Ninth Circuit has explained that "the failure of a state court to

24   instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question

25   and will not be considered in a federal habeas corpus proceeding."  *Solis v. Garcia*, 219 F.3d 922,

26

27   _____

     [8] *Disapproved on other grounds by People v. Barton*, 12 Cal. 4th 186, 200-01 (1995) (holding that
28   California trial courts have duty to *sua sponte* instruct on unreasonable self-defense when there is
     substantial evidence to support that theory of the defense; it is not an affirmative defense).

United States District Court
Northern District of California

929 (9th Cir. 2000) (alteration in original) (quoting *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984); *see also Beck v. Alabama*, 447 U.S. 625, 638, n.14 (1980) (expressly reserving decision on whether the failure to instruct constitutes cognizable habeas error in a non-capital case). To that effect, Petitioner does not cite any Supreme Court precedent in support of his argument to the contrary. *See* Mem. at 2 (citing pre-*Solis* Ninth Circuit decisions from between 1984 and 1999, without reference to any Supreme Court decisions).

Giving Petitioner the benefit of the doubt, the Court assumes that he is arguing that the trial court's decision not to give the instructions rose to the level of a due process violation under clearly established Supreme Court precedent. To be cognizable on federal habeas review, claimed error in omitting an instruction "must so infect[] the entire trial that the resulting conviction violated due process." *Menendez*, 422 F.3d at 1029 (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *accord Solis*, 219 F.3d at 929 (noting that "the defendant's right to adequate jury instructions on his or her theory of the case might, in some circumstances, constitute an exception to the general rule" that such a claim does not present a constitutional question cognizable on federal habeas). "Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury." *Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995). But a habeas petitioner whose claim involves the failure of a state court to give a particular instruction, as opposed to a claim that the court gave an incorrect instruction, bears an "especially heavy burden." *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155). "In addition, a state trial court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a presumption of correctness[.]" *Menendez*, 422 F.3d at 1029.

Petitioner has not met his burden. The state court's finding that the evidence at trial did not support a heat of passion instruction was not objectively unreasonable, and Petitioner's due process rights were not violated. The state court considered whether there was any evidence of provocation that caused Petitioner to feel personally menaced such that his emotions could have overtaken his judgment. It found that Petitioner's personal testimony—that there was a sudden quarrel and that he was afraid for his life—was insufficient. *Fernandez*, 2011 WL 5865063, at *9.

14

United States District Court
Northern District of California

1   Petitioner does not genuinely contest that synopsis of his testimony, instead contending that the

2   state court erred by failing to consider other defense evidence.  Pet., Mem. at 4-5 (discussing the

3   large group of gang members of which Naranjo was a part, the lay witness testimony of chaos

4   following the start of shooting, and his expert witness's testimony about confusion during live fire

5   confrontations).  Even accepting Petitioner's characterization of this evidence, the state court's

6   decision was not contrary to or an unreasonable application of Supreme Court precedent, and did

7   not involve an unreasonable determination of the facts.

8           Accordingly, the Court denies Petitioner's first claim.

9                   2.      Exclusion of Evidence

10          Petitioner's second claim is that the state court violated his right to a fair trial by excluding

11  evidence of Naranjo's gang membership.  Pet., Mem. at 9-13.  He contends that the exclusion of

12  such evidence undermined his theory of the defense: that he was defending himself against a rival

13  gang member who, along with his associates, was trying to kill him.  *Id.*, Mem. at 13.

14          "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules

15  excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)

16  (alteration in original) (internal quotation marks omitted).  This latitude is limited, however, by a

17  defendant's constitutional rights to due process and to present a defense, rights originating in the

18  Sixth and Fourteenth Amendments.  *See id.*  The exclusion of evidence does not violate those

19  rights unless "it offends some principle of justice so rooted in the traditions and conscience of our

20  people as to be ranked as fundamental."  *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).

21          "Assuming that the state trial court improperly excluded [the evidence at issue], in a

22  federal habeas proceeding [a court] must assess whether the improper exclusion of evidence

23  violated due process by examining [1] the probative value of the evidence on the central issue; [2]

24  its reliability; [3] whether it is capable of evaluation by the trier of fact; [4] whether it is the sole

25  evidence on the issue or merely cumulative; and [5] whether it constitutes a major part of the

26  attempted defense."  *Drayden v. White*, 232 F.3d 704, 711 (9th Cir. 2000) (internal quotation

27  marks omitted).  "The dispositive inquiry is whether the excluded evidence had probative value to

28  the central issue in the case."  *Hawley v. McEwen*, No. 12-cv-0501, 2015 WL 5440677, at *7

1   (N.D. Cal. Sept. 15, 2015) (citing *Walters v. McCormick*, 122 F.3d 1172, 1177 (9th Cir. 1997)).

2   Petitioner's habeas argument in this Court largely parallels the position he took before the

3   California Court of Appeal.  The state court summarized and discussed his argument as follows:

5   Defendant sought to present evidence that several witnesses, his codefendant Naranjo, and
the victims were all known members of the Norteño gang, as well as evidence gang culture

6   requires that gang members come to the aid of fellow members.  His trial counsel initially
argued the foregoing evidence was relevant to the credibility and bias of witnesses, and

7   later argued it was potentially relevant and admissible as to defendant's state of mind.  The
trial court initially withheld a ruling until it heard the defense evidence.

9   The issue was reconsidered after defendant testified.  During his testimony, he stated he
thought the men were members of the Rolison Rats, a Norteño gang.  Defense counsel

10   thereafter sought to introduce evidence Serrano was in fact a member of that gang.  The
prosecutor argued the evidence was inadmissible because it would be offered to invite

11   jurors to improperly infer from the men's gang membership that they must have acted
aggressively on a specific occasion—the night and early morning of April 14 and 15, 2006,

12   at the Headquarters Bar.  The prosecutor pointed out defendant was very clear he was
shooting at people who were shooting at him, but he did not know who those people were.

13   The trial court agreed the gang evidence was inadmissible, finding no nexus between it and
defendant's self-defense claim.

14   

15   Defendant's self-defense theory, as presented through his testimony, would also not have
been bolstered by evidence of the victims' gang membership or culture.  According to

16   defendant, his friends were attacked and he was being shot at by Norteños.  It was the fact
they were shooting at him, not their gang membership that he used to explain why he

17   began shooting and continued to shoot.  If the jury believed him, it would not have needed
to hear from a gang expert in order to understand how defendant would feel when persons

18   he believed were gang members were shooting at him.

20   Defendant also contends gang evidence would have affected the jury's evaluation of
witness credibility.  He suggests it would have demonstrated bias or concern about

21   retaliation.  In fact, the trial court did not rule out the use of gang membership evidence for
those purposes.  Instead, it laid down guidelines requiring defendant to spell out the need

22   for such impeachment evidence in connection with the actual testimony of specific
witnesses.  (*See People v. Bojorquez* (2002) 104 Cal.App.4th 335, 342-345 [recognizing

23   the probative value of gang evidence in establishing possible bias or fear must be carefully
weighed against its tendency to invite improper inferences about a member's conduct on a

24   given occasion].)  In our view, it was reasonable to require a particularized showing that
the probative value of gang membership evidence for impeachment purposes outweighed

25   its potentially prejudicial effects.  While the need for such a showing would have been
even more compelling if Naranjo had remained as a codefendant, it was still reasonable to

26   require it after he changed his plea, because of potential prejudice to the prosecution.
While defendant now complains in very general terms that he should have been allowed to

27   use gang evidence for impeachment purposes, he fails to specify particular witnesses who
should have been subject to such impeachment, or how the jury's evaluation of those

28   

United States District Court
Northern District of California

16

witnesses' credibility might have affected the outcome had it heard such evidence.

The trial court did not abuse its discretion by excluding gang evidence unless and until defendant could make a predicate showing of its relevance and probative value, either as to his claim of self-defense, or to impeach particular witnesses. Since he failed to do so, the evidence was properly excluded.

*Fernandez*, 2011 WL 5865063, at **9-10.

In the instant petition, Petitioner asserts only that the exclusion of evidence that Naranjo and his associates were known gang members was constitutional error with respect to his theory of self-defense, not for impeachment purposes. Pet., Mem. at 13. Assuming *arguendo* that the state court erred in excluding this evidence under state law, as the Court does for the purpose of federal habeas review, *see Drayden*, 232 F.3d at 711, the excluded evidence was only modestly probative of Petitioner's self-defense claim. The other shooters' gang membership could have been theoretically relevant in some way to Petitioner's theory of self-defense, but evidence to that effect is far less probative than the fact that people were shooting at Petitioner in the first place. A jury could easily conclude under these circumstances that being shot at in itself supports a claim of reasonable or unreasonable self-defense, regardless of the identity and purported behavioral characteristics of the shooters. For that reason, the fact that the jury did not find self-defense in this instance was almost certainly not a function of the exclusion of this evidence. This conclusion is bolstered by the fact that Petitioner testified that he believed the other shooters were gang members because of their clothing and behavior, which is direct evidence of his subjective state of mind as well as circumstantial evidence of the other shooters' actual gang membership. *See Fernandez*, 2011 WL 5865063, at *4 ("[Petitioner] did not know who was shooting at him, but thought he was a Norteño because of his clothing.").

In sum, the Court finds that that the state court's decision to exclude this evidence, on the totality of the record, was not contrary to or an unreasonable application of Supreme Court precedent, and did not involve an unreasonable determination of the facts. The Court thus denies Petitioner's second claim.

### 3.   Improper Jury Instructions on Self-Defense

Petitioner's third and final claim is that the state trial court erred in giving two instructions

on his self-defense theory.  Pet., Mem. at 14-17.  The state trial court gave the standard

instructions on perfect self-defense, CALCRIM 505,[9] and imperfect self-defense, CALCRIM

571,[10] but also instructed on mutual combat and the effect of being the initial aggressor,

CALCRIM 3471,[11] and instructed the jury that the right to self-defense may not be contrived,

[9] CALCRIM 505 provides that: "The defendant is not guilty of (murder/ [or] manslaughter/attempted murder/ [or] attempted voluntary manslaughter) if (he/she) was justified in (killing/attempting to kill) someone in (self-defense/ [or] defense of another). The defendant acted in lawful (self-defense/ [or] defense of another) if: 1. The defendant reasonably believed that (he/she/ [or] someone else/ [or] <insert name or description of third party>) was in imminent danger of being killed or suffering great bodily injury [or was in imminent danger of being (raped/maimed/ robbed/ <insert other forcible and atrocious crime>)]; 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; AND 3. The defendant used no more force than was reasonably necessary to defend against that danger. Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of death or great bodily injury to (himself/herself/ [or] someone else).  Defendant's belief must have been reasonable and (he/she) must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the [attempted] killing was not justified.  When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. [. . .]  The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified.  If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter).

[10] CALCRIM 571 provides that: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because (he/she) acted in (imperfect self-defense/ [or] imperfect defense of another). If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/ [or] defense of another) and (imperfect self-defense/ [or] imperfect defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable.  The defendant acted in (imperfect self-defense/ [or] imperfect defense of another) if: 1. The defendant actually believed that (he/she/ [or] someone else/ <insert name of third party>) was in imminent danger of being killed or suffering great bodily injury; AND 2. The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; BUT 3. At least one of those beliefs was unreasonable.  Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.  In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.  [. . .]  The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in (imperfect self-defense/ [or] imperfect defense of another). If the People have not met this burden, you must find the defendant not guilty of murder."

[11] CALCRIM 3471 provides that: "A person who engages in mutual combat or who is the initial aggressor has a right to self-defense only if: 1. He actually and in good faith tries to stop fighting; and 2. He indicates by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wants to stop fighting and that he has stopped fighting.  If a person meets these requirements, he then has a right to self-defense if the opponent continues to fight.  If you decide that the defendant started the fight using non-deadly force and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the

1    CALCRIM 3472.[12]  Petitioner objected to the latter two instructions on the basis that they were

2    not supported by the evidence and now contends that these instructions lightened the prosecutor's

3    burden of proof on the crime of murder in violation of the Sixth and Fourteenth Amendments.

4         Under California law, in the context of self-defense "mutual combat means not merely a

5    reciprocal exchange of blows but one pursuant to mutual intention, consent, or agreement

6    preceding the initiation of hostilities . . . .  In other words, it is not merely the combat, but the

7    preexisting intention to engage in it, that must be mutual."  *People v. Lam Thanh Nguyen*, 61 Cal.

8    4th 1015, 1044 (2015) (quoting *People v. Ross*, 155 Cal. App. 4th 1033, 1045 (2007)).

9         Petitioner's trial counsel failed to object to these two instructions regarding the effect of

10   mutual combat at trial.  *Fernandez*, 2011 WL 5865063, at *10. [13]  In the state court of appeal,

11   Petitioner argued that the trial court should have *sua sponte* refused to provide these instructions

12   or, alternatively, that his trial counsel rendered ineffective assistance of counsel by failing to

13   object.  *Id.*  Petitioner neither raises an ineffective assistance of counsel claim on habeas review

14   nor discusses the effect that this procedural posture might have on this collateral attack.  Because

15   Petitioner is not asserting an ineffective assistance claim in his petition, the Court confines its

16   inquiry to the question of whether the state trial court had a duty to *sua sponte* refuse to instruct

17   the jury as to these mutual combat instructions.

18        Turning to the substance of Petitioner's claim, first, with respect to the CALCRIM 3471

19   instruction, his habeas argument in this Court largely parallels the position he took before the

20   California Court of Appeal.  The state court summarized and discussed his position as follows:

21        There was testimony in this case that defendant's group, consisting of about five men
22        according to witness Cervantes, had been eyeing Hernandez and his friends in a hostile
         manner all evening until one of defendant's companions, dressed in a gray hooded sweater,
23        approached Hernandez and initiated some sort of argument.  Hernandez's girlfriend saw
         the man in the gray sweater try to provoke Hernandez into a fight.  The evidence
24        established this occurred just before Hernandez made his call to Calderon to ask for help.

25   _____

26   defendant had the right to defend himself with deadly force and was not required to try and stop
     fighting."
     [12] CALCRIM 3472 provides that: "A person does not have the right to self-defense if he or she
27   provokes a fight or quarrel with the intent to create an excuse to use force."
     [13] Because neither party discusses whether Petitioner's constitutional claim was waived by trial
28   counsel's failure to object, the Court does not either.

United States District Court
Northern District of California

Witness Alvarez saw Hernandez's friends walk over to the man in the gray sweater and signal for him to come outside to the patio with them, which he did. She saw men from both groups go out onto the patio, presumably including defendant. According to witness Arreola, defendant had told him at one point during the evening, "Don't worry, if there's trouble I got your back." According to witness Jimenez, defendant was part of a group of "pisas" facing off against Hernandez and his group. Once a fight broke out between Calderon and one of the pisas, and Calderon was hit, everybody started fighting. In our view, the foregoing constitutes ample evidence to support an instruction on mutual combat.

Defendant contends the court should have explained the meaning of mutual combat sua sponte, apparently to clarify that it does not mean both combatants willingly engage in a fight, but that they mutually consent to fight each other before any blow is struck. Defendant did not request such a clarification in the trial court or argue that point to the jury, and he has not shown there was any actual jury confusion on the issue. (*Cf. Ross*, *supra*, 155 Cal.App.4th at p. 1047.) Defendant's premise is that he was prejudiced because "there was no evidence of any on-going relationship, much less animosity between [him] and his group and Hernandez's group." He maintains he was not implicated in any hostile interaction between the man in the gray sweater and Hernandez, and cites testimony that the man was later heard to apologize to Hernandez in any event. At most, defendant points up a conflict in the evidence. In our view, considering all of the testimony about what transpired in the bar leading up to the fight and shootings, as discussed above, the jury could have reasonably inferred that the man in the gray sweater acted in concert with Mendes, Ramos, and defendant in seeking Hernandez out, and that defendant—as well as many others in the bar—felt the heightening tension and potential for trouble. The risk that the jury felt the mutual combat instruction applied merely because defendant willingly shot back once the shooting started seems negligible on this record.

*Fernandez*, 2011 WL 5865063, at **10-11.

Petitioner does not claim that the instruction on mutual combat was an erroneous statement of state law. His argument is that the instruction did not apply. Petitioner does not cite, and the Court did not locate, any clearly established law that constitutionally prohibits a trial court from instructing a jury with a factually inapplicable but accurate statement of state law. To that effect, the Supreme Court has explained, albeit in a slightly different context, that:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law-whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence[.]

*Griffin v. United States*, 502 U.S. 46, 59 (1991) (upholding a general guilty verdict where one of

the possible bases of conviction, while legally valid, was supported by inadequate evidence).[14]

Accordingly, to the extent that Petitioner's claim is based on the state trial court giving an

instruction on a factually inadequate theory, the Court denies the claim.

In any case, the California Court of Appeal found that there was some evidence to support

an instruction of mutual combat.  Specifically, as quoted above, the state court found:

> "[T]he jury could have reasonably inferred that the man in the gray
> sweater acted in concert with Mendes, Ramos, and defendant in
> seeking Hernandez out, and that defendant—as well as many others
> in the bar—felt the heightening tension and potential for trouble."

*Fernandez*, 2011 WL 5865063, at *11.  The Court cannot conclude that there was so little

evidence to support the inference that Petitioner engaged in mutual combat by agreeing with his

companions to engage in a fight with what was perceived to be a group of hostile gang members

that giving the instruction rendered the trial fundamentally unfair.  The state court's decision to

give the instruction was not contrary to or an unreasonable application of Supreme Court

precedent, and did not involve an unreasonable determination of the facts.  Accordingly, the Court

denies Petitioner's third claim as to the mutual combat instruction.

Second, with respect to the CALCRIM 3472 instruction on self-defense as a contrivance,

Petitioner's habeas argument in this Court largely parallels the position he took before the

California Court of Appeal.  The state court summarized and discussed his position as follows:

> There was also substantial evidence in the record supporting the use of CALCRIM No.
> 3472.  Defendant arrived at the bar carrying a loaded weapon and an extra clip of
> ammunition.  Joaquin Laguna testified defendant was acting in a loud, obnoxious, and
> demanding manner the entire night.  He was intoxicated and using drugs.  He and his
> friends were eyeing Hernandez's group the entire evening in such an obvious manner that
> multiple bar patrons noticed it.  Based on defendant's own testimony about how he
> perceived Hernandez's group, his state of intoxication, and the manner in which the
> conflict developed, the jury could infer that rather than being afraid of the group, defendant
> and his friends actively resented their presence in the bar and were repulsed by the way
> they dressed, danced, and acted.  The evidence also showed a member of defendant's
> group went out of his way to initiate a hostile interaction with Hernandez—an interaction
> that was sufficiently provocative and ominous to cause Hernandez to request

---

[14] The Court notes that Respondent's citation of *Griffin*, while not an incorrect paraphrase, contains a purported quotation found nowhere in the case.  This is unacceptable, and counsel is advised not to repeat this mistake.

United States District Court
Northern District of California

reinforcements.  Based on all of the evidence, the jury could infer the man in the gray sweater was not acting on his own, but was sent as an emissary from defendant and his companions to pick a fight.  Defendant's comment to Arreola, "if there's trouble I got your back," suggests defendant knew what was coming.  The rapidity and aggressiveness with which he responded to the first shot fired, the fact he advanced on his targets who were trapped against a fence, and the number of times he shot the unarmed victims when no one else was still shooting, tend to substantiate the theory that, far from being in fear for his life, defendant was seizing an opportunity to vent his rage at persons he resented.  Finally, although defendant denied on direct as well as cross-examination that he was looking for trouble that night, the jury was entitled to weigh the credibility of such denials along with the other evidence.

Even assuming for the sake of analysis that CALCRIM No. 3472 should not have been given on the facts of this case, we do not find it reasonably probable that it affected the jury's verdict.  Although sufficient to warrant the use of the instruction, the evidence supporting it was not particularly strong.  There was no evidence, for example, defendant directly engaged with Hernandez's group at any time prior to the shooting.  The jury in fact rejected the prosecution's premeditation/first degree murder theory which, as argued by the prosecution, was based on substantially the same premise and factual evidence as the instruction.  Applying the state law harmless error standard (*People v. Watson* (1956) 46 Cal.2d 818, 836), we therefore find no prejudice in the use of CALCRIM No. 3472.

*Fernandez*, 2011 WL 5865063, at **10-11.

Petitioner also does not claim that this instruction of state law was inaccurate.  For that reason, the Court again notes that Petitioner fails to cite clearly established law constitutionally prohibiting a trial court from instructing a jury on an irrelevant but accurate statement of state law. The state court's decision to give this instruction was not contrary to or an unreasonable application of Supreme Court precedent, and did not involve an unreasonable determination of the facts, and the Court denies Petitioner's claim as to this instruction.

Petitioner next argues that the prosecutor misled the jury regarding the law, citing *Deck v. Jenkins*, a Ninth Circuit decision which held that a prosecutor's misleading arguments to the jury constitute a constitutional violation "if they so infected the trial with unfairness as to make the resulting conviction a denial of due process."  — F.3d —, 2016 WL 518819, at *19 (9th Cir. 2014) (en banc) (holding that it is clearly established law that a prosecutor may not mislead the jury in a fundamentally unfair way) (citing *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986)). But Petitioner does not identify any statement by the prosecution that even approached this level. Petitioner argues that the prosecution made the following statement in reliance on the state trial court's offering of the challenged jury instruction:

1
2
3
4

> "When we talk about the law of self-defense you will find that it is an extremely limited right.  And among the things you don't get to do is get into a fight knowing and seeking the opportunity to use deadly force.  And this defendant, for whatever reason, was looking for trouble from the beginning that night.  I mean, I suggest to you that there is absolutely no believable contradictory evidence . . . and that alone includes (sic) self-defense, you're done with self-defense when you find and accept that as a fact.  We're done."

5   Pet., Mem. at 15.  Petitioner characterizes this statement as a "stingy version of the right to use

6   self defense[.]"  *Id.*  Considered in light of the totality of the trial evidence and the trial court's

7   instructions, the prosecutor's characterization did not render the trial fundamentally unfair, and the

8   Court denies Petitioner's habeas claim on this ground.

9        Additionally, although the state court found that there was sufficient evidence to instruct

10  on the issue of contrivance of self-defense, the state court acknowledged that "the evidence

11  supporting [this] theory was not particularly strong."  *Id.* at *12.  In light of that finding, the state

12  court also found that it was not reasonably probable that any error flowing from the state trial

13  court's decision to instruct on self-defense as a contrivance affected the jury's verdict, rendering

14  any error harmless.  *Id.*  It reasoned that if the jury was prejudiced by this instruction, it would not

15  have rejected the prosecution's attempt to convict on a theory of first-degree murder.  *Id.*  The

16  Court accords deference to the state court's harmless error determination and, in any case, finds

17  that any error by the state court did not have a "substantial and injurious effect or influence" such

18  that federal habeas relief is appropriate.  *See Garcia v. Long*, 808 F.3d 771, 781-82 (9th Cir. 2015)

19  (federal courts accord deference to state law harmless error determinations but ultimately apply

20  the *Brecht* harmless error test) (quoting *Brecht*, 507 U.S. at 623) (federal habeas relief is available

21  only if a state court's constitutional error had a "substantial and injurious effect or influence" on

22  the jury verdict or trial court decision).  Accordingly, the Court denies Petitioner's claim as to the

23  second instruction as to contrivance of self-defense.

24        Finally, Petitioner argues that the mutual combat and contrivance instructions

25  impermissibly lightened the burden of proof for the prosecution.  The California Court of Appeal

26  rejected that argument on the following basis:

27
28

> "We also reject defendant's claim—unsupported by any pertinent legal authority—that the use of CALCRIM Nos. 3471 and 3472 constituted federal constitutional error by improperly reducing the

United States District Court
Northern District of California

23

1    prosecution's burden of proving malice.   The use of these
     instructions did not prevent the jury from considering any evidence
2    relevant to establishing his defense, nor did they lighten the
     prosecution's burden of proving malice.

3    *Fernandez*, 2011 WL 586063, at *11.  The Court agrees.  There is no basis in the record for a

4    conclusion that the prosecution's burden of proving malice was lightened in any way.  The state

5    court's ruling was reasonable and correct, and the Court denies Petitioner's claim based on

6    unconstitutional burden-shifting.

7         **C.**      **Certificate of Appealability**

8         The federal rules governing habeas cases brought by state prisoners require a district court

9    that issues an order denying a habeas petition to either grant or deny a certificate of appealability.

10   *See* Rules Governing § 2254 Cases, Rule 11(a).  Granting such a certificate is appropriate "only if

11   the applicant has made a substantial showing of the denial of a constitutional right[.]"  28 U.S.C. §

12   2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the

13   showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that

14   reasonable jurists would find the district court's assessment of the constitutional claims debatable

15   or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  In this case, Petitioner has made no

16   showing warranting a certificate of appealability, and so none is granted.

17   **IV.   CONCLUSION**

18        For the foregoing reasons, the petition for writ of habeas corpus is hereby **DENIED**.  A

19   certificate of appealability also is **DENIED**.

20

21        **IT IS SO ORDERED.**

22   Dated: April 19, 2016

23

24                                        _Haywood S. Gilliam Jr._

25                                        HAYWOOD S. GILLIAM, JR.
                                         United States District Judge

26

27

28

United States District Court
Northern District of California

24